

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1181-11

### THE STATE OF TEXAS

### v.

### OCTAVIO ORTIZ, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SEVENTH COURT OF APPEALS
### LUBBOCK COUNTY

PRICE, J., delivered the opinion of the Court in which WOMACK, JOHNSON, KEASLER, HERVEY, ALCALA and COCHRAN, JJ., joined. KELLER, P.J., concurred in the result. MEYERS, J., not participating.

### O P I N I O N

During the course of a traffic stop, the appellee made incriminating statements. The

trial court suppressed the statements, finding that the appellee was in custody when the

statements were made and that he had not been properly Mirandized.[1]  The State appealed, and the Seventh Court of Appeals, in a published opinion, affirmed the trial court's determination that the appellee was in custody when he made the incriminating statements.[2] We granted the State's petition for discretionary review to examine the court of appeals's determination that the initial traffic stop had shifted into a custodial detention.  We now affirm.

## FACTS AND PROCEDURAL POSTURE

### In the Trial Court

The appellee was indicted for possession with the intent to deliver more than 400 grams of cocaine.[3]  Prior to trial, he filed a motion to suppress statements he made during a traffic stop, in which law enforcement officers discovered cocaine and subsequently arrested him.  At the motion to suppress hearing, the State called only one witness, the arresting officer, Corporal Jason Johnson of the Lubbock County Sheriff's Department.  During Johnson's testimony, the State admitted into evidence and played a video of the stop recorded from Johnson's squad-car camera.  The appellee presented no evidence.

Through Johnson's testimony, the State elicited the following narrative.[4]  On May 20,

---

[1]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]  *State v. Ortiz*, 346 S.W.3d 127 (Tex. App.—Amarillo 2011).

[3]  *See* TEX. HEALTH & SAFETY CODE §§ 481.112(a), (f) & 481.102(3)(D).

[4]  As the losing party at the motion to suppress hearing, the State requested written findings

2009, Johnson was assigned to criminal-interdiction patrol and was working on U.S. Highway 87, south of Lubbock. At approximately 10:30 a.m., Johnson clocked the appellee's Dodge Avenger, with Chihuahua, Mexico license plates, going thirteen miles per hour over the speed limit. Johnson initiated a traffic stop. Once the Avenger came to a stop, Johnson approached it and briefly questioned the appellee. After asking for the appellee's license and insurance information, Johnson asked the appellee to step out of the car and move to Johnson's patrol car, which was parked directly behind the appellee's car. There, Johnson began to question the appellee.[5] The appellee revealed that he was going, with his wife, Mrs. Ortiz,[6] to Spearman, Texas. Additionally, the appellee stated that he was on probation in Spearman "for drugs," specifically "one-eighth" of cocaine.[7]

After questioning the appellee, Johnson approached the appellee's car to question Mrs. Ortiz, who was sitting in the front passenger seat. Among other things, Mrs. Ortiz

---

of fact and conclusions of law. *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) ("[U]pon the request of the losing party on a motion to suppress evidence, the trial court shall . . . make findings of fact and conclusions of law[.]"). The narrative that follows is consistent with the written findings of fact as entered by the trial court. Those findings are amply supported by Johnson's testimony and the video recording of the stop.

[5]   The entire conversation between the appellee and Johnson took place in a mixture of English and Spanish. The trial court found that the appellee understood English and the State presented evidence that Johnson spoke sufficient Spanish to understand, and communicate with, the appellee.

[6]   The appellee's wife is not referred to by name in the record. We will simply refer to her throughout as "Mrs. Ortiz" for the reader's ease.

[7]   Johnson testified that "one-eighth" is "a common drug term" used to describe the quantity of drugs. But Johnson did not testify, and the State did not present any other evidence, as to the actual weight that "one-eighth" describes.

explained that they were traveling to Gruver, Texas. Because this explanation conflicted with the appellee's account, Johnson called for backup officers.[8] While waiting for backup to arrive, Johnson returned to the appellee, and asked him "point blank," "How much drugs are in the car?"[9] The appellee responded "No. No. No. No." The appellee then consented to a search of his person and his car. While Johnson searched the appellee, backup officers, Deputy Pierpoint and Officer Vargas, arrived.[10] Vargas approached the appellee's car, in which Mrs. Ortiz remained seated. Mrs. Ortiz stepped out of the vehicle, apparently at Vargas's direction, and Vargas began to pat her down. When Mrs. Ortiz apparently made movements to avert the patdown, Vargas started to handcuff her, and Pierpoint came to Vargas's aid.

Shortly after handcuffing Mrs. Ortiz, Pierpoint and Vargas signaled back to Johnson, indicating that they had apparently discovered something during the patdown of Mrs. Ortiz. Johnson then turned to the appellee and said, "Yep. Turn around. Put your hands behind your back." Johnson then handcuffed the appellee. About this time, Pierpoint walked back to Johnson's patrol car and informed Johnson that Vargas had found "something" under Mrs.

---

[8] Johnson expressly requested that a female officer be included among the backup officers who could conduct a pat-down search of Mrs. Ortiz. It is unclear whether the appellee could have overheard the request for backup, so we do not consider that fact in our custody analysis, *post*.

[9] Although Johnson asked this question in Spanish, during his testimony he also provided the English translation.

[10] The record does not reveal the specific law enforcement agency (or agencies) Pierpoint and Vargas belonged to. Vargas was the female officer who responded to Johnson's call for a backup officer who could pat down Mrs. Ortiz.

Ortiz's skirt.[11]  Johnson then turned to the appellee and asked him in Spanish, "What kind of drugs does your wife have?"  After prompting Johnson to repeat the question, which Johnson did, the appellee responded, "coca."  Johnson began to repeat the question, again in Spanish, "What kind of drugs . . .?"  Before Johnson could finish, the appellee cut him off, answering, "cocaina."  Johnson explained that "coca" and "cocaina" are Spanish words for cocaine.[12]  The appellee was not given *Miranda* warnings before making the cocaine statements.  It is the admissibility of the cocaine statements that is now the subject of our review.[13]

---

[11] Later in his testimony, Johnson revealed that the "something" under Mrs. Ortiz's skirt was a kilo of cocaine that was duct taped to her leg.  At the time Pierpoint revealed that "something" was under Mrs. Ortiz's skirt, Pierpoint did not know—or at least did not specifically say—that the "something" she had was cocaine.  Because Pierpoint did not specifically *say* that Mrs. Ortiz had cocaine, that information was not related to Johnson within the appellee's earshot, and we will also omit this specific fact from our custody analysis, *post*.

[12] Hereinafter, we will refer to the statements that the appellee made in response to Johnson's questions concerning the type of drugs that Mrs. Ortiz had on her person as "the cocaine statements."

[13] Johnson further testified that, after he asked the appellee the questions that elicited the "cocaine" statements, Vargas moved Mrs. Ortiz to Johnson's patrol car, where the appellee and Johnson stood.  With both the appellee and Mrs. Ortiz then present, Johnson asked about the quantity of the cocaine ("How much?"), to which both Mrs. Ortiz and the appellee responded, "un kilo," meaning one kilo in Spanish (hereinafter, the "un kilo" statement).  The trial court also granted the appellee's motion to suppress his "un kilo" statement.

In order to trigger *Miranda*, the suspect must not only be in custody, but he must also be under interrogation.  *Miranda*, *supra*, at 444.  In the court of appeals, the State conceded that the appellee made the "un kilo" statement while in custody, but argued that the statement was not the product of interrogation.  According to the State, the question Johnson asked that prompted the "un kilo" statement did not amount to interrogation because Johnson did not direct the question to the appellee.  The court of appeals resolved this issue by deferring to the trial court's finding of fact that Johnson had, in fact, directed his question concerning the quantity of drugs to the appellee.  Therefore, the court of appeals concluded, the "un kilo" statement was a product of interrogation.

Based on Johnson's testimony and the video recording of the traffic stop, the trial court found that, by the time he was placed in handcuffs, the appellee was arrested and in custody for *Miranda* purposes. Because Johnson failed to advise the appellee of his *Miranda* rights before asking him the series of questions that elicited the cocaine statements, the trial court expressly ruled that those statements were inadmissible and must be suppressed. The State filed an interlocutory appeal.[14]

**In the Court of Appeals**

The court of appeals affirmed the trial court's ruling.[15] In *Berkemer v. McCarty,* the United States Supreme Court announced the general rule that a traffic stop ordinarily amounts only to a temporary detention, and the occupants of the detained vehicle are not

---

The State also argued in the court of appeals that the appellee did not make the "cocaine" statements in response to interrogation because general routine inquiries when an officer initially arrives on the scene do not constitute interrogation. *Jones v. State*, 795 S.W.2d 171, 175 n.3 (Tex. Crim. App. 1990). The court of appeals held that Johnson's questions that provoked the "cocaine" statements were "practically certain to elicit an incriminating response." *Ortiz*, *supra*, at 135. For this reason, the court of appeals concluded that the "cocaine" statements were also a product of interrogation.

In its petition for discretionary review, the State has not raised an issue as to whether the appellee was actually being interrogated when he made either the "cocaine" statements or "un kilo" statement. Additionally, the State has conceded that the "un kilo" statement was made while the appellee was in custody. Admissibility of the "un kilo" statement is, therefore, not before us. Nor must we decide whether the appellee made the "cocaine" statements in response to interrogation. The only issue before us is whether the appellee was in custody when he made the "cocaine" statements.

[14]

TEX. CODE CRIM. PROC. art. 44.01(a)(5).

[15]

*Ortiz*, *supra*, at 132.

subjected to custody for *Miranda* purposes.[16]  If, during the course of the detention, however, an occupant's freedom is constrained to the "degree associated with formal arrest," then Fifth Amendment protections are triggered and a suspect is entitled to *Miranda* warnings.[17] Applying this standard, the court of appeals concluded that, given all the circumstances, the appellee was legally in custody when he made the cocaine statements.[18]  In reaching this conclusion, the court of appeals did not provide a particularly in-depth analysis of how the law should apply to the facts presented; it simply invoked the appropriate case law, cataloged the facts of the appellee's case, and somewhat summarily announced its conclusion.  We granted the State's petition for discretionary review in order to take a closer look.

## THE LAW

### Appellate Standard of Review

When reviewing a trial court's findings of fact and conclusions of law regarding a motion to suppress evidence, an appellate court must give almost total deference to the trial court's assessment of historical facts.[19]  The same deference is afforded to the trial court's conclusions with respect to mixed questions of law and fact that turn on credibility or

---

[16] 468 U.S. 420, 440 (1984).

[17] *Id*. at 440 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

[18] *Ortiz*, *supra*, at 132 (citing George E. Dix & John M. Schmolesky, 41 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 16:25 (3d ed. 2011)).

[19] *Derichsweiler v. State,* 348 S.W.3d 906, 913 (Tex. Crim. App. 2011).

demeanor.[20]  When the posture of a case does not present issues of pure fact, or of mixed questions of law and fact that turn on credibility or demeanor, and presents only questions of the validity of the trial court's "legal rulings"—as in the instant case—an appellate court's review is *de novo*.[21]

### The *Miranda* Custody Analysis as Applied to Traffic Stops

Generally, a routine traffic stop does not place a person in custody for *Miranda* purposes.[22]  But a traffic stop may escalate from a non-custodial detention into a custodial detention when formal arrest ensues or a detainee's freedom of movement is restrained "to the degree associated with a formal arrest."[23]  We evaluate whether a person has been detained to the degree associated with arrest on an *ad hoc*, or case-by-case, basis.[24]  In making the custody determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his movement "comparable to . . . formal

---

[20] *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997).

[21] *Id.* at 89.  *Cf. State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) ("[F]actual findings are who did what, when, where, how, or why.  They also include credibility determinations. They do not include legal rulings on 'reasonable suspicion' or 'probable cause'; those are legal conclusions subject to *de novo* review, not deference.").

[22] *State v. Stevenson*, 958 S.W.2d 824, 828  (Tex. Crim. App. 1997) (citing *Berkemer*, *supra*).

[23] *Berkemer*, *supra*, at 440;  *Stevenson, supra*, at 828 (citing *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996) and *Ussery v. State*, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983)).

[24] *Dowthitt*, *supra*, at 255 (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985)).

arrest," given all the objective circumstances.[25]

In evaluating whether a reasonable person would believe his freedom has been restrained to the degree of formal arrest, this Court looks only to the objective factors surrounding the detention.[26] The subjective beliefs of the detaining officer are not included in the calculation of whether a suspect is in custody.[27] But if the officer manifests his belief to the detainee that he is a suspect, then that officer's subjective belief becomes relevant to the determination of whether a reasonable person in the detainee's position would believe he is in custody.[28] Conversely, any undisclosed subjective belief of the suspect that he is guilty of an offense should not be taken into consideration—the reasonable person standard presupposes an "innocent person."[29]

## ANALYSIS

Applying this standard, we agree with the court of appeals that, at the moment that Johnson elicited the cocaine statements from the appellee, a reasonable person in the appellee's position would have believed, given the accretion of objective circumstances, that

---

[25]

*Berkemer*, *supra*, at 441; *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam).

[26]

*Dowthitt*, *supra*, at 255 (citing *Stansbury*, *supra*, at 323).

[27]

*Id*.; *Stevenson*, *supra*, at 829.

[28]

*Dowthitt*, *supra*, at 254 (citing *Stansbury*, *supra*, at 323).

[29]

*Dowthitt*, *supra*, at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).

he was in custody. The objective facts show that, by that time: (1) Johnson had expressed his suspicion to the appellee "point blank" that he had drugs in his possession; (2) two additional law enforcement officers had arrived on the scene; (3) Mrs. Ortiz and the appellee had both been patted down and handcuffed; and (4) the officers had manifested their belief to the appellee that he was connected to some sort of (albeit, as-yet undisclosed) illegal or dangerous activity on Mrs. Ortiz's part. These circumstances combine to lead a reasonable person to believe that his liberty was compromised to a degree associated with formal arrest.

**Johnson Expressed his Suspicion to the Appellee that He Possessed Drugs**

The State complains that the court of appeals did not presuppose an innocent person when making its determination that the appellee was in custody. Specifically, according to the State, the trial court took into consideration the appellee's subjective knowledge that his wife had cocaine on her person. The State is correct, of course, that only the objective circumstances known to the detainee should be considered in deciding what a reasonable person in his position would believe. But we disagree that the court of appeals included the appellee's subjective knowledge that Mrs. Ortiz possessed cocaine in its custody analysis. Instead, the court of appeals took into consideration Johnson's suspicion that the appellee had drugs, which Johnson unmistakably communicated to the appellee during the course of the detention. No more than ten minutes into the stop, Johnson expressly accused the appellee of having drugs ("How much drugs are in the car?"), asked for permission to search both the

appellee's car and his person, and began searching.[30] Later, after Pierpoint informed Johnson that Vargas had found "something" under Mrs. Ortiz's skirt, Johnson asked the appellee—more than once—"What kind of drugs does she have?" This question, by its very nature, conveyed to the appellee Johnson's presupposition that the appellee was aware that his wife possessed drugs and that the appellee knew what kind of drugs she possessed. Johnson's overt attitude concerning the appellee's likely complicity, because it would have been readily apparent to the appellee, constituted "one among many factors that bear upon the assessment of whether [the appellee] was in custody."[31] It provides substantial support for the court of appeals's conclusion that a reasonable person in the appellee's position would have believed he was in custody by the time he made the cocaine statements.[32]

### Coercive Nature of the Stop

A normal traffic stop is a non-custodial detention because it is brief and relatively

---

[30] The exact duration of the events that we describe here is not perfectly apparent from Johnson's testimony. However, the trial court admitted the video of the traffic stop into evidence and watched it in open court. We have also reviewed the video, and the timing of Johnson's initial accusation and request to search the appellee's person and car, as we describe it in the text above, is not inconsistent with the trial court's written findings of fact and is, in any event, indisputably established by the video evidence. *Cf. Carmouche v. State*, S.W.3d 323, 332 (Tex. Crim. App. 2000) (under some circumstances, video evidence may present "indisputable visual evidence").

[31] *Stansbury*, *supra*, at 325.

[32] At the time Johnson conducted the traffic stop, the appellee was on probation for cocaine. When Johnson approached the appellee's car, Johnson had no way of knowing that the appellee had prior drug-related arrests. But the appellee told Johnson he was on probation for cocaine possession. Because the appellee was aware that Johnson knew about the appellee's prior drug related crime, it is another objective factor to consider in the custody analysis.

non-coercive.[33]  In holding that a traffic stop is generally less coercive than a custodial detention, the *Berkemer* Court observed that, during a traffic stop, a detainee is typically "only confronted by one or at the most two policemen[,which] further mutes his sense of vulnerability."[34]  By the time he made the cocaine statements in this case, however, the appellee's detention had escalated into something inherently more coercive than a typical traffic stop.  An ordinary traffic stop usually involves a single police car and one or two officers.  The appellee was faced with at least two police cars and three officers by the time he made the cocaine statements.  While this is hardly an overwhelming show of force, it adds at least marginally to the court of appeals's conclusion that the appellee was in custody for *Miranda* purposes at that time.

### Handcuffing

The State worries that the court of appeals in this case adopted a blanket rule that handcuffing a traffic suspect automatically means that the suspect is in custody.  In our view, however, the court of appeals properly relied on handcuffing as only one of a range of relevant factors in its determination that the appellee was in custody for Fifth Amendment purposes.[35]  The court of appeals certainly did not categorically hold, as the State suggests,

---

[33]  *Berkemer*, *supra*, at 437-38.

[34]  *Id*. at 438;  *See also*, *Pennsylvania v. Bruder*, 488 U.S. 9, 10-11 (1988) (per curiam) (citing the fact that only one police officer conducted the stop to support the conclusion that the defendant was not in custody during a normal traffic stop).

[35]  *See Howes v. Fields*, 132 S. Ct. 1181, 1193 (2012) (holding that physical restraints are at least one factor to consider in the custody analysis).

that the mere act of handcuffing, by itself, will establish custody.

Here, not only was the appellee handcuffed—he was handcuffed right after Mrs. Ortiz was handcuffed. In the course of Mrs. Ortiz's patdown, Vargas and Pierpoint signaled to Johnson, who was standing with the appellee, that they had found something illegal or dangerous. By immediately handcuffing the appellee as well ("Yep. Turn around. Put your hands behind your back."), Johnson conveyed to the appellee Johnson's belief that the appellee was associated with his wife's illicit behavior—whatever it may have been. This circumstance lends additional support to the court of appeals's conclusion that a reasonable person in the appellee's shoes would have realized that the detention had transcended the boundaries of a mere traffic stop and blossomed into a custodial arrest for a much more serious (if, as yet, undisclosed) offense.

**Officer Pierpoint's Actions After Handcuffing**

Finally, one more event contributes to the conclusion that a reasonable person in the appellee's position would believe he was in custody when he made the cocaine statements. After the appellee was handcuffed, Pierpoint approached Johnson and announced, in the appellee's presence, that the officers had indeed found "something" under Mrs. Ortiz's skirt. This would have further reinforced the appellee's perception that both his wife and, by association, he himself, were now under detention for some illegality substantially more serious than a mere speeding infraction. Had Pierpoint not made his announcement within the appellee's earshot, we agree with the State that it would not be relevant to the custody analysis. But because the appellee apparently heard it, it does properly constitute an

objective factor in the custody determination.

### The Accretion of Objective Circumstances
### Establishes Custody for *Miranda* Purposes

All of these circumstances combine to support the court of appeals's ultimate conclusion that a reasonable person in the appellee's position would have believed he was in custody when he made the cocaine statements. By that time, Johnson had expressly accused the appellee, more than once, of having drugs in his car or on his person and implied that he believed that the appellee was aware of what kind of drugs his wife possessed. Multiple backup officers had arrived on the scene. Vargas and Pierpoint had signaled to Johnson, in the appellee's presence, that Mrs. Ortiz had something illegal or dangerous. Pierpoint and Vargas had handcuffed Mrs. Ortiz, and Johnson had handcuffed the appellee immediately thereafter, signaling his belief that the appellee shared complicity in her transgression. Pierpoint then confirmed, within the appellee's earshot, that Vargas had indeed found something illegal or dangerous hidden under Mrs. Ortiz's skirt. Even the presumptively innocent reasonable person—that is to say, the reasonable person whom we must presume to have been unaware of the kilo of cocaine under his wife's skirt—would have believed, under the objective circumstances, that his liberty was constrained to a degree consistent with formal arrest for *some* substantial offense.[36]

---

[36] As we have mentioned, the State concedes that appellee made the "un kilo" statement while in custody. *See* note 13, *ante*. But the State argues that the appellee was *not* in custody when he made the "cocaine" statements. The State argues that it was only after the appellee made the "cocaine" statements, communicating to the officers his knowledge of Mrs. Ortiz's possession of drugs, did sufficient objective circumstances exist to support a custody determination.

## Addendum: The *Dowthitt* Categories

Finally, the State complains that the court of appeals erred by failing to determine in its custody analysis whether the circumstances of the appellee's traffic stop satisfy one of categories recognized in *Dowthitt v. State*.[37] In *Dowthitt*, we reiterated four situations, originally described in *Shiflet v. State*,[38] which, we said "may constitute custody:"[39]

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.[40]

The State complains that the court of appeals upheld the suppression of the "cocaine" statements only because of the proximity in time of the "cocaine" statements to the custodial "un kilo" statement—only one minute and twenty seconds separates them. State's Brief at 43. We do not believe that this is a fair reading of the court of appeal's opinion. The court of appeals did note that the State's position "draws a fine line between relatively fast-moving events." *Ortiz*, *supra* at 132. However, the same combination of objective circumstances that supports the conclusion that the appellee was in custody when he made the "cocaine" statements also supports the conclusion that the "un kilo" statement was made in custody—Johnson's manifested suspicion that drugs were present, the somewhat coercive nature of the stop, the handcuffing of Mrs. Ortiz and the appellee, and the final implication by Pierpoint of the appellee's complicity in Mrs. Ortiz's offense. The "cocaine" statements themselves undoubtedly lend *additional* support to the conclusion that the appellee made the "un kilo" statement while in custody. But this does not detract from our holding that, by the time the appellee made the "cocaine" statements, the combined circumstances *already* sufficed to demonstrate that he was in custody. The court of appeals did not err to conclude otherwise.

[37] State's Brief at 16.

[38] 732 S.W.2d at 629.

[39] *Dowthitt*, *supra*, at 255.

[40] *Id*. (citing *Shiflet*, *supra*, at 629).

But in light of the United States Supreme Court's decisions in *Beheler* and *Stansbury*,[41] in *Dowthitt* we qualified the *Shiflet* categories. We explained that, for the first through third of these categories to constitute *Miranda* custody, *Beheler*/*Stansbury* required a restriction on a detainee's freedom of movement that was more than just "significant"—it must be "to the degree associated with an arrest."[42] With regard to the fourth category, we explained that the officer's belief that probable cause exists must be "manifested to the suspect."[43]

The State maintains that the court of appeals was required to, but did not, fit the facts of the instant case into one of these four *Dowthitt* categories before it could declare that the appellee was in custody for *Miranda* purposes. But this is a distortion of the import of our holding in *Dowthitt*. The *Dowthitt* categories were intended to be merely descriptive, not exhaustive. We held that the four categories "*at least* . . . may constitute custody."[44] We never said that, in order for a set of circumstances to constitute custody, an appellate court must be able to fit it into one of these descriptive categories. The State's suggestion

---

[41] *Beheler*, *supra*, at 1125; *Stansbury*, *supra*, at 322.

[42] *Dowthitt*, *supra*, at 255. The State seems to complain that the court of appeals mistakenly applied the "significant" deprivation-of-freedom standard under *Shiflet*'s first category of facts sufficient to establish Fifth Amendment custody—without properly adding *Dowthitt*'s "to the degree associated with an arrest" gloss. State's Brief at 33. We do not construe the court of appeals's opinion to have made this mistake, however, and we have certainly not made it ourselves in our review and affirmation of its ultimate holding today.

[43] *Id*.

[44] *Id*. (emphasis added).

otherwise is at odds with our insistence, in *Dowthitt* itself, that Fifth Amendment custody determinations should be made on a case-by-case basis, considering all of the objective circumstances.[45] Moreover, in cases we have decided since *Dowthitt*, we have consistently applied *Dowthitt's ad hoc* approach, without necessarily referring to any of the particular *Dowthitt* categories.[46] In any event, even if we were required to wedge the circumstances of the appellee's detention into one of the four *Dowthitt* categories, we would conclude that they fit comfortably within *Dowthitt*'s first category. After all, as we have already held, the objective circumstances of the appellee's detention, by the time he made the cocaine statements, would lead a reasonable person to believe that he was "physically deprived of his freedom of action . . . to the degree associated with an arrest."[47]

## CONCLUSION

The court of appeals did not err to affirm the trial court's conclusion that a reasonable person in appellee's position would have believed, given all the objective circumstances, that, at the moment he made the cocaine statements, he was in custody for Fifth Amendment purposes. Accordingly, we affirm the judgment of the court of appeals.

DELIVERED:        October 31, 2012
PUBLISH

---

[45] *Id.*

[46] *See, eg.*, *Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007); *Stevenson, supra*.

[47] *Dowthitt, supra*, at 255.