**Affirmed and Memorandum Opinion filed May 7, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00722-CR

---

**LEE CARL BANKS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 209th District Court
Harris County, Texas
Trial Court Cause No. 1210223**

---

## M E M O R A N D U M    O P I N I O N

A jury convicted appellant Lee Carl Banks of murder and assessed punishment at life imprisonment. Appellant challenges his conviction in six issues contending the trial court erred by denying his motions to suppress. We affirm.

# I. BACKGROUND

At about 1:00 a.m. on March 30, 2009, Corporal Jefferson Riggins with the Grady County, Georgia, Sheriff's Office stopped appellant's vehicle near Cairo, Georgia, because it did not have working taillights and it veered from its lane of travel twice. Riggins observed that the vehicle had sustained severe damage to the rear. Riggins radioed for another officer, Steve Clark, to join the stop and bring the "intox box" because Riggins initially suspected that appellant was intoxicated. The officers determined the vehicle was unsafe to drive, and a tow truck was called. During the traffic stop, the officers learned that the vehicle did not belong to appellant and was connected to a missing-person report from Texas. That missing person was Spenser Vogt, the complainant.

Appellant consented to a search of the vehicle and informed the officers that there was a gun in the vehicle. The officers discovered what appeared to be blood inside the vehicle and on appellant's pants. The officers questioned appellant throughout the stop, but the questioning ceased when the officers informed appellant that he would be taken to jail for an "investigative hold." On March 30 or 31, appellant was brought before a magistrate and charged with theft by bringing stolen property into Georgia.[1] Appellant requested a public defender, and a lawyer was appointed to represent him.

In Texas, Detective Jeff Martin with the Fort Bend County Sheriff's Office began investigating the missing person report on the morning of March 30. He learned of appellant's arrest in Georgia and went to appellant's home. He saw a pool of blood on the back patio, spatterings of blood on leaves and the ground nearby, and the impression of tire tracks leading up to and away from the back door. On March 31, Martin and Texas Ranger Kip Westmoreland drove to

---

[1] *See* GA. CODE ANN. § 16-8-9 (2011).

Georgia. They arranged to meet with appellant on April 1.

Appellant was brought from the jail to an arraignment room near the sheriff's office. Martin and Westmoreland introduced themselves to appellant, and they all went into an interview room, which was being recorded. Martin told appellant to have a seat and asked if everybody was nice to him or anybody was ugly to him. Appellant said, "No." Martin said, "Well, let me get started. Let me make some notes because we are going to talk for a little while, I'm sure." Westmoreland said, "You seem like you've got a pretty good head on your shoulders—" but then appellant interrupted and spoke, almost completely uninterrupted,[2] for about 40 minutes. Among other things, appellant said that a "mystery man" forced his way into appellant's home and made appellant kill Vogt, take Vogt's car, dispose of the body, and leave Texas. Martin and Westmoreland then gave appellant *Miranda*[3] warnings, and appellant consented to being questioned.[4] The interrogation lasted for about another five hours. Appellant gave the officers a description of where he left Vogt's body, and he admitted there was no mystery man. He said he shot Vogt accidentally.

On April 2, police officers in Texas obtained a search warrant for appellant's residence. Officers also discovered Vogt's body elsewhere, and an autopsy revealed two gunshot entrance wounds. Appellant was charged with capital murder on April 3. Martin and Westmoreland drove back to Georgia and

---

[2] About a minute into appellant's statement, Westmoreland offered to remove appellant's handcuffs. Appellant declined, but the officers insisted and removed the handcuffs. About five minutes later, appellant said another person referred to "fucking . . . excuse me, effing money," and Martin said, "Well, if he says it, you can say it."

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] Westmoreland did not testify at the suppression hearing, but Martin did. When asked whether the lack of *Miranda* warnings during the first 40 minutes was "unintentional or an accident that [he] forgot," Martin explained, "I didn't forget to read him his *Miranda* rights. [Appellant] started talking and I didn't interrupt him."

interrogated him on the evening of April 5. Appellant received *Miranda* warnings at the beginning of that interrogation, and he consented to being questioned. He initially stuck to the accident story, but he eventually said that he killed Vogt to get away in his car. On April 7, police officers obtained a search warrant for appellant's cell phone records.

At trial, appellant filed motions to suppress all of his oral statements and the evidence seized as a result of the search warrants. The trial court suppressed the unwarned segment of the April 1 interview (roughly the first 40 minutes), but the court denied suppression for the remainder of the evidence.

The State presented a capital murder theory that appellant killed Vogt during the course of a robbery. The jury acquitted appellant of capital murder and found him guilty of murder.

## II. ANALYSIS

In six issues, appellant contends the trial court erred by denying his motions to suppress. His first four issues address his oral statements allegedly made during custodial interrogations, and his last two issues concern the validity of the search warrants.

## A. Custodial Interrogations

*Miranda* warnings safeguard a person's constitutional privilege against self-incrimination during a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). Similarly, Article 38.22, Section 3, of the Code of Criminal Procedure governs the admissibility of oral statements made during a custodial interrogation, requiring warnings similar to *Miranda* and the electronic recording of these statements. *See id.* at 526 (citing TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (West 2005)). *Miranda* warnings and Article 38.22 requirements

4

are mandatory only when there is a custodial interrogation. *Id.* The defendant bears the initial burden to prove that a statement was the product of a custodial interrogation. *Id.*

"In reviewing a trial court's ruling on a *Miranda*-violation claim, an appellate court conducts a bifurcated review: it affords almost total deference to the trial judge's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor, and it reviews de novo the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor." *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We view the evidence presented on a motion to suppress in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court does not file findings of fact, as here, we assume the trial court made implicit findings in support of its ruling as long as those findings are supported by the record. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We will affirm the trial court's ruling if it is correct under any theory of law applicable to the case. *Id.* at 855–56.

Issues concerning custody and interrogation are reviewed de novo when, as here, questions of historical fact do not turn on the credibility and demeanor of the witnesses. *See Alford*, 358 S.W.3d at 653 (interrogation); *Herrera*, 241 S.W.3d at 527 (custody).

### 1. Appellant was not in custody during the roadside stop (Issue 1).

In his first issue, appellant argues that the trial court should have suppressed his statements made during the roadside stop because his unrecorded and unwarned statements resulted from a custodial interrogation in violation of *Miranda* and Article 38.22. The State contends, among other things, that appellant was not in custody.

5

Generally, a person is not in custody during a routine traffic stop. *State v. Ortiz,* 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). "But a traffic stop may escalate from a non-custodial detention into a custodial detention when formal arrest ensues or a detainee's freedom of movement is restrained to the degree associated with a formal arrest." *Id.* (quotation omitted). A person is in custody only if "a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Herrera*, 241 S.W.3d at 525 (quotation omitted). "In making the custody determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his movement comparable to . . . formal arrest, given all the objective circumstances." *Ortiz*, 382 S.W.3d at 372 (omission in original; quotation omitted). This inquiry is made on an ad hoc, or case-by-case, basis. *Id.* The meaning of "custody" is the same for purposes of *Miranda* and Article 38.22. *Herrera*, 241 S.W.3d at 526.

Riggins and Clark testified at the suppression hearing; appellant did not testify. Riggins testified that at the beginning of the stop, while appellant was still in his vehicle, Riggins asked about the damage to the vehicle. Appellant said he was rear-ended in Georgia by another vehicle, he reported the accident, and another officer told him the vehicle was safe to drive. Riggins told appellant that Riggins did not believe an officer would allow him to leave an accident scene in that vehicle. Riggins asked appellant to exit the vehicle, and appellant complied. Riggins testified that he "called for a tow vehicle earlier when the stop actually had just started due to the damage of the vehicle."

Riggins also "ran the VIN" from the vehicle by reading it over his radio. Riggins and appellant stood by the rear of the vehicle, and Riggins noticed that appellant was shaking and appeared cold. Riggins asked appellant if he would like

6

to sit in the rear of the patrol car because Riggins had the heat on in his car. Appellant "freely got in the back of the car." Riggins did not advise appellant that he was under arrest, did not pat him down, and did not handcuff him. Appellant still possessed his cell phone. Clark had left the scene earlier during the stop, but he returned while appellant was still in the patrol car.

Appellant could not open the door from inside the patrol car, but at one point Riggins opened the door for appellant to get out and smoke a cigarette. Riggins asked appellant if somebody could come pick him up; appellant said he knew some people in the neighboring county. While standing outside the patrol car, Riggins noticed what appeared to blood on appellant's pants. Appellant said that it was mud, not blood. Riggins also received information about the VIN at that time from a peace officer in Texas; Riggins learned that the vehicle was "attached to a missing person out of Texas." Riggins asked appellant if he knew Vogt and how appellant had come to have control of the vehicle. Appellant denied knowing Vogt and said his "Aunt Pat" gave him the vehicle.

Appellant consented to a vehicle search and told Clark there was a gun in the vehicle. Clark found the gun during the search and also saw what appeared to be blood on the back seat. Clark called the Texas peace officer after seeing the blood and made the decision to place appellant on an "investigative hold." Riggins told appellant that he was going to be transported to the jail and placed on the investigative hold. Riggins testified that appellant was under arrest and not free to leave at that point. Appellant made no further statements.

On appeal, appellant cites only one case as factually analogous: *Campbell v. State*, 325 S.W.3d 223 (Tex. App.—Fort Worth 2010, no pet.). However, *Campbell* involved vastly different circumstances: the defendant was handcuffed, and there was no testimony that the handcuffing was for officer safety or some

7

other non-arrest purpose. *Id.* at 236. When the defendant was handcuffed in that case, he was "physically deprived of his freedom of action," and a "reasonable person would believe his freedom of movement had been significantly restricted." *Id.* The court held further that the defendant was not in custody before the handcuffing even though an officer took possession of the defendant's car keys. *See id.* at 235.

Here, appellant was not handcuffed or patted down, which militates against a finding of custody. *Cf. Ortiz*, 382 S.W.3d at 373 (finding custody when the defendant had been patted down and handcuffed). The mere fact that he was "allowed" to sit in the locked patrol car does not establish custody. *See Keaton v. State*, 755 S.W.2d 209, 210 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (finding no custodial interrogation even though the defendant was "put" into the patrol car). Although appellant may have been "the 'focus' of an investigation," this fact "does not necessarily render a person 'in custody.'" *Gardner v. State*, 306 S.W.3d 274, 293 (Tex. Crim. App. 2009). Finally, although appellant argues on appeal that the officers had probable cause to arrest him, the record supports an implied finding that the officers did not "manifest" any such belief to appellant before he made any statements. *See Ortiz*, 382 S.W.3d at 373–74, 376 (noting that custody may be established if an officer's belief that probable cause exists is "manifested to the suspect"; finding custody when the officers "manifested their belief" to the defendant that he was connected to illegal activity by asking him "How much drugs are in the car?" and "What kind of drugs does she have?"). Riggins and Clark did not testify that they told appellant they believed him to be connected to illegal activity before appellant made any statements.

The evidence viewed in the light most favorable to the trial court's ruling establishes that appellant was not in custody during any time that he made

statements to these officers. Appellant's first issue is overruled.

**2. Appellant was not being interrogated during his unwarned statements at the sheriff's office, and thus, the officers did not deliberately employ a "question first, warn later" tactic (Issues 2 and 4).**

In his second and fourth issues, appellant argues that his statements from both interviews with Martin and Westmoreland should have been suppressed because appellant's "waivers of *Miranda* and [Article] 38.22 warnings were the result of the officers deliberately employing a two-step interrogation technique."[5] The State contends, among other things, that there was no interrogation until after the officers had given the required warnings and appellant had waived his rights; thus, there was no "question first" two-step interrogation, and appellant's *Miranda* and Article 38.22 waivers were valid.

"A 'question first, warn later' interrogation technique consists of officers interrogating a suspect without providing *Miranda* warnings and obtaining a confession; then, after the inculpatory statements are made, officers provide *Miranda* warnings and obtain a waiver of the warnings." *Vasquez v. State*, No. 14-

---

[5] In his second issue, appellant contends that suppression was required by Article 38.22, Section 6, of the Code of Criminal Procedure. In his fourth issue, appellant contends that suppression was required by Article 38.22, Section 3(a)(2); his argument in its entirety is that "[a]ll of the facts and law in the first three Points of Error apply to this Point of Error and the court is requested to consider the same in this Point of Error." His first issue concerns the roadside stop, and his third issue concerns the Sixth Amendment. His fourth issue, therefore, appears multifarious. *See, e.g.*, *McCambridge v. State*, 712 S.W.2d 499, 501 n.9 (Tex. Crim. App. 1986). In the interest of justice we will address the issue in the context of his "question first" argument. *See Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). Further, although appellant cites Article 38.22, he makes no specific arguments predicated on Texas state law, and he relies solely on authority concerning the "question first" tactic prohibited by federal constitutional principles. Appellant provides no argument or authority for interpreting Texas law differently than federal law on this subject, and we do not address his contentions based on Texas state law that have been inadequately briefed. *See, e.g.*, *Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993); *Morehead v. State*, 807 S.W.2d 577, 579 n.1 (Tex. Crim. App. 1991).

12-0096-CR, — S.W.3d —, 2013 WL 1248304, at *1 (Tex. App.—Houston [14th Dist.] Mar. 28, 2013, no pet. h.) (citing *Missouri v. Seibert*, 542 U.S. 600, 604–05 (2003) (plurality op.)). "Officers then have the suspect repeat the inculpatory statements in an attempt to cure the lack of *Miranda* warnings." *Id.* (citing *Seibert*, 542 U.S. at 605). "[W]hen a two-step interrogation technique is used in a deliberate, calculated way to undermine *Miranda* warnings, absent 'curative measures,' the post-warning statements must be excluded." *Id.* at *2 (citing *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring)).

However, if the defendant's initial statements were not made during a custodial interrogation in violation of *Miranda*, then the "question first" tactic has not been employed, and we do not apply the specific "question first" analysis. *See United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) ("Consequently, because the first two statements were not obtained in violation of *Miranda*, the district court erred in applying *Seibert*."); *Ervin v. State*, 333 S.W.3d 187, 213 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (rejecting the defendant's "question first" argument "because appellant was not in custody when the first two statements were given"); *Zuniga-Durate v. State*, No. 14-10-00967-CR, 2012 WL 1205170, at *8–9 (Tex. App.—Houston [14th Dist.] Apr. 10, 2012, pet. ref'd) (mem. op., not designated for publication) ("[T]o undermine *Miranda* in a calculated manner by conducting a 'question-first' interrogation technique, *Miranda* must first apply to the earlier unwarned statements. . . . Because *Miranda* warnings were not required prior to the other noncustodial statements, a 'question-first' interview tactic could not have been employed deliberately to circumvent the protections of *Miranda*."); *Bridges v. State*, No. 05-09-00784-CR, 2011 WL 285847, at *9 (Tex. App.—Dallas Jan. 31, 2011, pet. ref'd) (not designated for publication) ("*Seibert* applies only if the officer obtained the first statement in

10

violation of *Miranda*.”).

We agree with the State that a “question first” analysis should not be used in this case because *Miranda* warnings were not required when appellant gave his unwarned statement—he was not being interrogated. An “interrogation” for purposes of *Miranda* means “(1) express questioning and (2) ‘any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.’” *Alford*, 358 S.W.3d at 653 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The inquiry focuses on the perceptions of the suspect rather than the intent of the police. *Id.* In determining what constitutes an interrogation, we recognize that “the *Miranda* safeguards do not exist to protect suspects from the compulsion inherent in custody alone, nor do they protect suspects from their own propensity to speak, absent some police conduct which knowingly tries to take advantage of the propensity.” *Jones v. State*, 795 S.W.2d 171, 176 n.5 (Tex. Crim. App. 1990).

According to Martin’s testimony and the video-recorded evidence, appellant was brought to the sheriff’s office to meet with Martin and Westmoreland, and the officers introduced themselves. The officers asked if anyone was treating appellant badly and then made several statements that were not questions: (1) Martin said, “Well, let me get started. Let me make some notes because we are going to talk for a little while, I’m sure”; and (2) Westmoreland said, “You seem like you’ve got a pretty good head on your shoulders—” At that point, appellant interrupted, “Yeah, um, I’m a just start off with you gentlemen right off the bat because I’ve been going in the wrong path—a very, very, very wrong, wrong path—and I mean, I’ve been calling for an investigator all day to try to talk to them [inaudible] but I guess they haven’t called, or better yet they were waiting for you

11

guys to get to Georgia." Appellant proceeded to talk for about 40 minutes before the officers gave him the required warnings and obtained his waiver. The officers asked no questions during that time, and their only interaction was to remove appellant's handcuffs and suggest that appellant could use profanity in their presence.

The inquiry is not whether appellant in fact made incriminating statements, which he did; rather, we must determine whether the officers should have known that their words and conduct were reasonably likely to elicit an incriminating response.

In *Moran v. State*, the Court of Criminal Appeals found no interrogation when the officer told the suspect in a murder investigation that "we had already spoken to" several people, including a person to whom the suspect had confessed. *See* 213 S.W.3d 917, 922–23 (Tex. Crim. App. 2007).[6] The court reasoned that it was "significant that appellant never testified that [the officer's] reply to him about having spoken to the other people caused him to re-initiate the conversation with [the officer] and incriminate himself." *Id.* at 923. Here, appellant did not testify at the suppression hearing that anything Martin or Westmoreland said or did caused him to make incriminating statements. Rather, he said at the beginning of his statement that he had "been calling for an investigator all day to try to talk to them."

Decisions from the courts of appeals similarly suggest that appellant was not being interrogated at the time he made his spontaneous statement after brief introductions and Martin's comment ("we are going to talk for a little while"). *See Badall v. State*, 216 S.W.3d 865, 868–69 (Tex. App.—Beaumont 2007, pet. ref'd)

---

[6] The court also found a lack of custody and error preservation. *Moran*, 213 S.W.3d at 923.

(no interrogation when the officer asked how the defendant was doing, where he lived, and how many businesses he owned, and in response to a question from the defendant about the victim's condition, the officer said the victim would survive, to which the defendant said he would need to get the job done right next time); *Dossett v. State*, 216 S.W.3d 7, 23–25 (Tex. App.—San Antonio 2006, pet. ref'd) (no interrogation when the defendant had already been questioned about other offenses at the police station when he was in custody, but he later volunteered information about a dream; reasoning that because the defendant was "eager to talk," the statement was a "spontaneous, volunteered statement[] not made in response to interrogation"); *State v. Ridemour*, No. 07-05-0339-CR, 2006 WL 947749, at *3 (Tex. App.—Amarillo Apr. 12, 2006, no pet.) (mem. op., not designated for publication) (no interrogation when the officer engaged the defendant in conversation about diabetes, asked him if he was alright, removed his handcuffs, and arranged for him to have some coffee).

Martin and Westmoreland certainly intended to interrogate appellant, and they might have done so if appellant had not interrupted—"[b]ut in this case, [the officers] did not have the opportunity to do so because [appellant] spoke up so quickly." *Cf. State v. Maldonado*, 259 S.W.3d 184, 186, 188, 191 (Tex. Crim. App. 2008) (no Sixth Amendment violation based on the "deliberate elicitation" test—which conferred "more protection than its Fifth Amendment counterpart"— when the officer arranged for the defendant to be brought to a separate area of the jail, "merely introduced himself," and then the defendant responded, "I have been waiting to talk to somebody or talk to you guys," and the defendant handed the officer a letter).

Because appellant was not being interrogated during the first 40 minutes of his statement, we do not apply the "question first" analysis. This holding

13

necessarily diverges from the trial court's conclusion that appellant was being interrogated during the first 40 minutes of his statement.[7]  We will affirm a trial court's ruling on any theory of law applicable to the case, *see Ross*, 32 S.W.3d at 855–56, and our holding does not rest on any implied historical factual findings contrary to the trial court's legal conclusion.  *See Johnson v. State*, 359 S.W.3d 725, 734–35 (Tex. App.—Houston [14th Dist.] 2011, pet. granted) (McCally, J., concurring).  There are two possible reasons the trial court concluded that appellant was being interrogated: (1) the trial court found Martin's testimony to be credible, and the facts proven by that testimony and the video constitute "interrogation" as a matter of law; or (2) the trial court did not find Martin's testimony to be credible. *See Ross*, 32 S.W.3d at 857.  Under the first scenario, we disagree with the trial court's legal conclusion; but we may not presume the first scenario because that would be to presume error.  *See id.*  Even under the second scenario, however, we disagree with the trial court's conclusion because appellant had the burden to prove facts amounting to an interrogation; mere disbelief of the State's witness does not satisfy that burden.  *Compare id.* at 857 (affirming the trial court's suppression of evidence based on the trial court's implied disbelief of the sole testifying officer's undisputed testimony concerning probable cause for a warrantless arrest; considering "which party had the burden of proof"), *and Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991) ("The burden is on the State to prove the existence of probable cause to justify a warrantless arrest or search."), *with State v. Kelly*, 204 S.W.3d 808, 819 & n.22, 820 (Tex. Crim. App. 2006) (reversing the trial court's decision to suppress despite viewing the evidence in the light most favorable to the defendant; noting that the defendant had the burden of proof and "the party with the burden of proof assumes the risk of nonpersuasion"), *and*

---

[7] The trial court suppressed this portion of appellant's April 1 statement.

14

*Herrera*, 241 S.W.3d at 526 ("[T]he defendant bears the initial burden of proving that a statement was the product of 'custodial interrogation' . . . ."). In short, regardless of any credibility determinations, we disagree with the trial court's legal conclusion that appellant was being interrogated for purposes of *Miranda*.

Appellant makes no reasoned argument for suppression other than the "question first" analysis. He points to no other factors indicating that his statement and waiver of his rights were involuntary under federal or Texas law, and the record supports the trial court's conclusion that appellant's statements and waivers were voluntary. *See generally Oursbourn v. State*, 259 S.W.3d 159, 170–172 (Tex. Crim. App. 2008) (discussing some relevant circumstances for finding a statement involuntary under both federal and state law).[8]

Appellant's second and fourth issues are overruled.

### 3. Appellant did not preserve error regarding his waiver of counsel (Issue 3).

In his third issue, appellant contends he "did not voluntarily, knowingly and intelligently waive his right to counsel," and "there were no waivers of the Appellant's 6th Amendment right to counsel." This argument does not comport with the objection in the trial court, and thus, he has failed to preserve error. *See, e.g.*, *Rothstein v. State*, 267 S.W.3d 366, 373–74 (Tex. App.—Houston [14th Dist.]

---

[8] In arguing the "question first" issue, appellant notes that in response to Martin's question about whether appellant would waive his rights, appellant said he had "no choice," and Martin did not correct him. The "no choice" statement is taken out of context; appellant said: "Yeah, I mean, at this point I have no choice. Yes, sir, I understand everything and I will talk to you all and let you all know." The isolated "no choice" comment, viewed under the totality of the circumstances in the light most favorable to the trial court's ruling, does not require suppression based on a finding that appellant was coerced or compelled to waive his rights and give a statement or that his will was overborne. *Cf. State v. Terrazas*, 4 S.W.3d 720, 729 (Tex. Crim. App. 1999) ("[The investigator] telling appellee 'what had to be' in her statement does not support a finding or legal conclusion of 'involuntariness' or state action that overbore appellee's will.").

2008, pet. ref'd).

Appellant argued in his written motion to suppress that Martin and Westmoreland "violated the defendant's U.S. CONST. 6 amendment right to counsel when they interviewed the defendant on April 1, 2009 and April 5, 2009 and obtained video-taped statements from him ***without first notifying the defendant's attorney Richard Parker***" (emphasis added). Similarly, trial counsel argued to the court that the officers violated appellant's Sixth Amendment right to counsel by the mere fact that the officers "ask[ed] him questions about bringing the stolen car into Georgia . . . ***in the absence of counsel***" (emphasis added).

Thus, appellant argued in the trial court that his right to counsel was violated by the mere fact that he was represented by counsel and interviewed without notice to counsel. This argument may have been meritorious in times past. *See, e.g.*, *Holloway v. State*, 780 S.W.2d 787, 795 (Tex. Crim. App. 1989) ("Only through notice to defense counsel may authorities initiate the interrogation of an indicted and represented defendant.").[9] But the trial court properly denied appellant's motion to suppress on the ground presented. *See Pecina v. State*, 361 S.W.3d 68, 78 (Tex. Crim. App. 2012) (stating that a defendant's request for counsel at an arraignment, initial appearance, or Article 15.17 hearing "says nothing about his possible invocation of his right to counsel during later police-initiated custodial

___

[9] *See also Maldonado*, 259 S.W.3d at 186 & n.5 (finding no violation of the Sixth Amendment "deliberate elicitation" test in part because the officer "did not bring up the subject of talking to appellee until after appellee handed him the letter"; noting that the officer testified, "I told him that I was going to talk to him or we were going to talk," but finding no record evidence to indicate that this statement occurred before the defendant handed the officer a letter). Regarding the April 1 interview, however, appellant's Sixth Amendment right to counsel did not attach for the Texas murder investigation by the mere fact that appellant was appointed counsel for the Georgia stolen-property offense. *See, e.g.*, *Texas v. Cobb*, 532 U.S. 162, 172–173 (2001) (holding that the Sixth Amendment "attaches only to charged offenses," with "offenses" being defined under the *Blockburger* test; thus, there was no Sixth Amendment violation when police interrogated the defendant about murders even though he was under indictment for burglary of the murder victims' home, and his confession was admissible in his capital murder prosecution).

interrogation"); *see also Montejo v. Louisiana*, 556 U.S. 778, 792 (2009) ("[I]t would be completely unjustified to presume that a defendant's consent to police-initiated interrogation was involuntary or coerced simply because he had previously been appointed a lawyer."). In *Montejo*, the United States Supreme Court expressly overruled a case that had barred police-initiated interrogations occurring after a defendant's request for counsel at an arraignment. *See* 556 U.S. at 797, *overruling Michigan v. Jackson*, 475 U.S. 625, 636 (1986).

Trial counsel never argued that appellant's Sixth Amendment right to counsel was violated for any reason other than the fact that appellant had been appointed a lawyer. On appeal, appellant now contends his waiver was involuntary because he was diagnosed with a psychotic disorder, mental retardation, and impairment in reality testing or communication. He cites to his mental health examinations for competency and sanity found in the Clerk's Record. This evidence was not introduced at the motion to suppress hearing, and the issue was not raised by the written motion or otherwise during the hearing. Appellant did not preserve error concerning his mental capacity to waive his right to counsel. *See, e.g.*, *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) (explaining that to preserve error, an appellant must at least "let the trial judge know what he wants [and] why he thinks himself entitled to it").

Appellant's third issue is overruled.[10]

## B. Search Warrants

In his fifth and sixth issues, appellant contends that evidence seized pursuant to two search warrants should have been suppressed because the affidavits

---

[10] Appellant also mentions his "no choice" comment under this issue, but this lone comment does not require a conclusion that appellant's waiver was involuntary. *See supra* note 8; *see also Montejo*, 556 U.S. at 795 ("[D]octrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver.").

supporting the warrants failed to establish sufficient and substantial facts to satisfy a magistrate that probable cause existed as required by Articles 18.01 and 18.02 of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. arts. 18.01, 18.02 (West 2005 & Supp. 2012).

"Ordinarily the warrant process involves the presentation to a neutral and detached magistrate of an affidavit that establishes probable cause to conduct a search." *Jones v. State*, 364 S.W.3d 854, 857 (Tex. Crim. App. 2012). "After reviewing the supporting affidavit in 'a commonsensical and realistic manner,' a reviewing court must uphold the magistrate's decision so long as the magistrate had a substantial basis for concluding that probable cause existed." *Id.* (quoting *State v. McClain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011)). "Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is at least a 'fair probability' or 'substantial chance' that contraband or evidence of a crime will be found at the specified location." *Flores v. State*, 319 S.W.3d 697, 703 (Tex. Crim. App. 2010).

We review a magistrate's decision to issue a warrant with great deference, looking only to the four corners of the supporting affidavit. *Jones*, 364 S.W.3d at 857. "'[T]he magistrate's decision should carry the day in doubtful or marginal cases, even if the reviewing court might reach a different result upon de novo review.'" *Id.* (quoting *Flores*, 319 S.W.3d at 702). In determining whether probable cause exists, "the magistrate may interpret the probable cause affidavit in a non-technical, common-sense manner and he may draw reasonable inferences from it." *Flores*, 319 S.W.3d at 702.

1. **The first affidavit was sufficient to establish probable cause that evidence of a crime would be found at appellant's residence, where Vogt was shot in the head (Issue 5).**

18

Appellant argues that the affidavit was insufficient to establish probable cause for a search of his residence, the place where Vogt was shot and killed. We disagree.

The affiant was Detective S. Costello with the Fort Bend County Sheriff's Office, and the affidavit contained significant details sufficient to establish probable cause, including among other things: (1) Vogt's mother said Vogt went missing on March 27, 2009, and was driving her vehicle, which was described in detail with the VIN; (2) appellant was apprehended in Georgia while driving that vehicle; (3) appellant said that he and Vogt were at the property to be searched on March 27, 2009; (4) appellant "stated that 'Spenser' found his gun in his room and thereafter a struggle ensued and the gun went off striking 'Spenser' in the head"; (5) appellant said he wrapped Vogt's head in plastic bags, placed his body in the vehicle, and transported the body to a location in Houston; (6) based on appellant's "directions and descriptions, your Affiant was able to locate" Vogt's body on April 1, 2009; (7) another detective communicated with Dr. Chu, an assistant medical examiner at the Harris County Medical Examiner's Office; (8) "Your affiant was advised that the Complainant's death was caused by a gunshot wound to the left temple of the head, a homicide"; (9) Chu said that "the firearm was less than 6 inches away from the Complainant's wound because of the presence of soot and gunpowder within the wound"; (10) Vogt "suffered a second gunshot wound to the base of his head, which was not fatal"; and (11) affiant's partner went to the property sought to be searched on March 30, 2009, and "observed what he believes to be blood on the backdoor patio."

Appellant complains that the affidavit did not establish probable cause because it did not address (1) who owned the gun; (2) who was engaged in the struggle or whether appellant was involved in the struggle; (3) who shot the gun or

19

whether appellant had the gun or shot the gun; (4) whether appellant had intent; (5) whether Vogt was alive or deceased when the non-fatal gunshot wound was fired; (6) who fired the non-fatal shot; (7) any particular items of evidentiary value being at the location searched; and (8) any explanation about the timing of the two gunshots. Appellant contends further: "There is no specific time frame in the affidavit for the discharges of the weapon, the time or the date of the death of the Complainant, the time the Complainant's body was transported and the time the doctor examined the Complainant's body." Finally, appellant complains that there is no basis for Chu's conclusion that the death was a homicide, and that appellant "is never mentioned as the person responsible for shooting the Complainant." Appellant cites no factually analogous cases to support his conclusion that these missing facts needed to be included in the probable cause affidavit.

Most of appellant's contentions can be rejected because a magistrate could infer the missing facts from the affidavit, or the facts are not necessary for a finding of probable cause. For example, the affidavit states, in reciting what appellant told Martin: "He stated that 'Spenser' found his gun in his room and thereafter a struggle ensued and the gun went off." A reasonable inference is that the gun belonged to appellant and that Vogt and appellant were the only two people engaged in the struggle. Further, a magistrate could infer from the affidavit the timing of these events as occurring very recently, and appellant makes no complaint that the information was stale. *See, e.g.*, *Jones*, 364 S.W.3d at 862–63 (affidavit had no staleness problem when the affiant said he "recently" learned of information, and a magistrate could infer that a controlled drug buy occurred after learning of that information).

A common sense and non-technical reading of the affidavit shows that appellant admitted to struggling with Vogt over a gun at the place to be searched

for evidence, the gun fired at close range while pointed at Vogt's head at the place to be searched, Vogt was killed at the place to be searched, appellant disposed of the body by transporting it away from the place to be searched, appellant fled from the place to be searched, and blood was located on the patio of the place to be searched. There is a fair probability or substantial chance that evidence related to murder would be found at the scene of a shooting that resulted in death from a close-range gunshot wound to the complainant's head. *Cf. Flores*, 319 S.W.3d at 703 (probable cause established to search a suspect's home when police found marijuana residue on two occasions within five days' time in trash cans in front of the suspect's house, and an anonymous informer said he or she had seen drugs inside the suspect's house in the past on an unspecified date).

Appellant's fifth issue is overruled.

## 2. The second affidavit was sufficient to establish probable cause that evidence of a crime would be found in appellant's cell phone stored communications and transactional information (Issue 6).

Appellant argues that the affidavit was insufficient to establish probable cause for a search of his cell phone communications and transactional information. We disagree.

Detective Costello's second affidavit omitted the allegation about Vogt and appellant struggling for the gun, but in addition to the facts alleged in the first affidavit, the second affidavit alleged that: (1) appellant said "he wanted to steal Complainant's vehicle, so he took a gun from his bedroom, used a pillow to disguise or muffle the sound of the gunshot, and shot Complainant twice in the head"; (2) affiant learned from Vogt's friends and family that Vogt was deaf, and due to this disability, Vogt would communicate by text message when using his cellular phone; (3) Vogt's family provided affiant with Vogt's cell phone number;

21

(4) appellant had a cell phone in his possession when he was apprehended; (5) Martin provided affiant with the electronic serial number for that cell phone; (6) affiant learned the phone number assigned to that serial number; and (7) affiant had previously obtained call detail records for Vogt's cell phone, which revealed "numerous text messages originating from or terminating to" appellant's telephone number "on March 27, 2009, the date of Complainant's death."

Appellant acknowledges, "Based on the affidavit on its face, the Appellant wanted to steal the Complainant's vehicle so he shot the Complainant twice in his head." However, appellant contends, "There is no indication whatsoever anywhere in the warrant that it will produce evidence of the offense of murder much less any other offense." Appellant cites no authority to support his conclusion.

The affidavit established that Vogt and appellant exchanged "numerous text messages" on the date of the murder, to which appellant had confessed. Further, appellant was carrying his phone with him when he was arrested, and a reasonable inference is that he had the cell phone at the time of the murder and throughout his travels; thus, historical cell site location information could be used to identify his whereabouts for the relevant time period. We conclude there is a fair probability or substantial chance that evidence of a murder would be found in the communications and transactional information of a cell phone belonging to a suspect who had confessed to murdering the complainant and who exchanged numerous text messages with the complainant on the date of the murder.

Appellant's sixth issue is overruled.

### III.   CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/          Sharon McCally
Justice

Panel consists of Justices Boyce, McCally, and Donovan.

Do Not Publish — TEX. R. APP. P. 47.2(b).