**Affirmed and Memorandum Opinion filed November 17, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00581-CR

**JARRET  WYATT  ANGST, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 81030-CR**

## MEMORANDUM  OPINION

A jury found appellant guilty of capital murder, and the trial court assessed the mandatory punishment of imprisonment for life without parole.  In three issues, appellant contends that the evidence is legally insufficient to support the conviction, the trial court erred by denying his motion to suppress, and the trial court erred by denying his request for the jury to assess punishment.  We affirm.

# I.   SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant contends that the evidence is insufficient to prove that he committed a murder in the course of a burglary or for remuneration, as alleged in the indictment. Regarding burglary, appellant contends that the State failed to prove that he "entered [the decedent]'s house to commit any crime."[1]

Although appellant admitted before trial to entering the decedent's house and shooting the decedent, appellant contends that because his multiple statements to police "ranged from a claim of complete innocence with a defense of alibi to an admission that he shot [the decedent] twice in the head that his multiple statements failed to reach the level of beyond a reasonable doubt proof to support a Capital Murder conviction." Appellant also contends that there is a lack of physical evidence placing him inside the decedent's house.

## A.   Legal Principles

When reviewing the sufficiency of the evidence, we consider all of the admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding the defendant guilty beyond a reasonable doubt. *Curry v. State*, No. PD-0577-18, 2019 WL 5587330, at \*6 (Tex. Crim. App. Oct. 30, 2019). The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Id.* Juries can draw any reasonable inference from the facts so long as each inference is supported by the evidence. *Id.*

---

[1] Because we ultimately conclude that the evidence is sufficient to support appellant's conviction under the burglary theory of capital murder, we focus our discussion of the law and facts regarding burglary rather than the remuneration theory. *See Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995) (holding that evidence need only be sufficient to establish one of the underlying felonies in the indictment).

A person commits capital murder if the person intentionally commits a murder in the course of committing or attempting to commit burglary. *See* Tex. Penal Code § 19.03(a)(2). A person commits burglary if the person, without the effective consent of the owner, enters a habitation and commits or attempts to commit a felony or assault. *See id.* § 30.02(a)(3). In a capital murder case predicated on a burglary, "the requirement that a felony be committed is satisfied by the actual murder of the victim." *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995). The State does not need to prove that the defendant formed the intent to commit the murder before entering the habitation. *See Homan v. State*, 19 S.W.3d 847, 849 (Tex. Crim. App. 2000).

## B.    Evidence

Police officers interviewed appellant several times before trial. Initially, he denied involvement in the murder. Ultimately, he confessed to driving with his friend to the decedent's house to do a "job," which was to stop the decedent from harassing the decedent's ex-wife. A third party had promised appellant's friend that she would leave real property to the friend in her will if the friend and appellant did this job. She gave the men two pistols and the decedent's address.

Appellant and his friend brought the loaded pistols to the decedent's house. Appellant told the police that he believed that the plan was for his friend to put a gun to the decedent's face while appellant acted as backup. When the decedent refused to open the door, the friend shot through a window and broke down the door. Appellant entered the house and shot the decedent twice. Appellant and the friend fled.

Police officers found four shell casings inside the house. The State adduced evidence that the casings had been fired from appellant's gun.

3

## C.  Analysis

As appellant notes in his brief, he admitted to greater levels of involvement in the murder with each successive pretrial interview.  Indeed, he admitted to entering the decedent's house after the door had been broken down and then shooting the decedent.  As the sole judge of the credibility and weight of the evidence, the jury was free to believe or disbelieve any portion of appellant's statements.  *See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005) (sufficient evidence of intent to commit capital murder based on some of the defendant's admissions despite the defendant's denial of an intent to kill the decedent).  Physical evidence also placed appellant inside the house because four shell casings that had been fired from his gun were located inside the house.  *Cf. Diamond v. State*, 496 S.W.3d 124, 136 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (affirming capital murder conviction partly based on evidence that a gun found in the defendant's car was uniquely capable of creating the casings that were found at the murder scene).

Considering all of the evidence in the light most favorable to the verdict, the jury rationally could have found beyond a reasonable doubt that appellant murdered the decedent while in the course of committing a burglary because appellant entered the decedent's habitation without consent and committed a felony or assault.

Appellant's first issue is overruled.

## II.  MOTION TO SUPPRESS

In his second issue, appellant contends that the trial court erred by denying his motion to suppress his oral statements to police officers.  Appellant challenges the trial court's conclusion that the statements were not the product of custodial

interrogations, and he contends that the statements should have been suppressed because officers did not inform appellant of his constitutional and statutory rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966); Tex. Code Crim. Proc. art. 38.22, § 3.

## A.     Legal Principles

*Miranda* and Article 38.22 warnings are required only when there is a "custodial interrogation." *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). A defendant has the initial burden to prove that a statement was the product of a custodial interrogation. *Id.*

A person is in custody if the person is formally arrested or if the person's freedom of movement has been restrained to the degree associated with a formal arrest. *Thai Ngoc Nguyen v. State*, 292 S.W.3d 671, 677 (Tex. Crim. App. 2009). A person is not necessarily in custody by reason of being temporarily detained by police. *See Keuther v. State*, 523 S.W.3d 798, 808 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd); *see also State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). But, a non-custodial detention may escalate into a custodial detention if the detainee's freedom of movement is restrained to the degree associated with a formal arrest. *Ortiz*, 382 S.W.3d at 372. The primary question is whether a reasonable person would perceive the detention to be a restraint on the person's movement comparable to a formal arrest, given all of the objective circumstances. *Id.*

The Court of Criminal Appeals has identified four general situations that may constitute custody: (1) the person is physically deprived of the freedom of action in any significant way; (2) an officer tells the person that the person is not free to leave; (3) officers create a situation that would lead a reasonable person to believe that the person's freedom of movement has been significantly restricted;

and (4) there is probable cause to arrest the person, the officers' knowledge of probable cause is communicated to the person, officers do not tell the person that the person is free to leave, and other circumstances combine that would lead a reasonable person to believe that the person is restrained to the degree of a formal arrest. *See Gardner v. State*, 306 S.W.3d 274, 294 & n.48 (Tex. Crim. App. 2009) (citing *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996)).

In reviewing the trial court's ruling on a motion to suppress, we afford almost total deference to the trial court's rulings on questions of historical fact and on the application of law to fact questions that turn upon credibility and demeanor. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). If credibility and demeanor are not necessary to the resolution of an issue, whether a set of historical facts constitutes custodial interrogation is subject to do novo review. *Id.* at 653. Then, the issue of custodial interrogation is an issue of law that requires the application of legal principles to a specific set of facts. *Id.*

## B. Circumstances Regarding Appellant's Unwarned Statements

Detective Chris Turner with the City of Pearland Police Department testified that he went to appellant's place of employment on the day after the murder to keep watch on appellant's car while other officers were seeking a search warrant for the car. Turner was in an unmarked pick-up truck and wearing a polo shirt and jeans.

When appellant left his employer for the day at about 4:00 p.m. and approached his car, Turner introduced himself and asked for appellant's identification. Audio of the interaction was recorded and introduced as an exhibit during the suppression hearing. A large crowd was coming out of the building at the same time. Turner asked appellant some questions, such as whether the car belonged to appellant. Turner asked appellant, "Give me one second before you go

in your car, okay?" Turner called for backup and then asked appellant some questions such as what time he arrived for work, what time he got off work, and where he lived.

When Turner was about to explain "the situation," appellant said that he heard on the news that a man was found killed in his house and a car that was involved was a silver Ford Taurus (like appellant's car). Turner said that he didn't "know the whole thing" and that he was told to come out and see if this car was there. Turner said that a different detective was in charge and wanted to come talk to appellant. Detective Turner said he didn't have any questions to ask appellant, and he told appellant to "hang out" for about ten minutes until the other detective arrived. Appellant said, "Alright," and then asked, "They don't think I did it, do they?" Turner told appellant that he did not know and that it was not his case, and Turner was just on that side of town. Turner said that the person who could answer appellant's questions was on his way.

Turner asked appellant additional questions like how long appellant worked for his employer, what he did for work, how long he lived at his house, and the like. Turner did not ask questions about the murder investigation, did not place appellant in handcuffs, and did not place appellant in the pick-up truck. Turner did not explicitly tell appellant that he could or could not leave. The recording lasted about eleven and a half minutes.

The second detective, John DeSpain, arrived before the search warrant was executed.[2] DeSpain drove a black Chevrolet Impala to the scene and wore "a polo

---

[2] On appeal, appellant contends that Turner "held Appellant in the parking lot for at least 3 hours" until DeSpain arrived. Appellant bases this assertion on the fact that the search warrant was not signed until 6:41 p.m. This inference—that DeSpain did not arrive until after the search warrant was signed—is contrary to the trial court's ruling and not supported by the record. Turner testified that he did not recall how long appellant waited in the parking lot. During

and 511 pants." During the recorded interrogation of appellant, DeSpain and appellant sat in the front seats of DeSpain's car. Appellant was not handcuffed.

An audio recording of the interrogation was admitted as an exhibit during the suppression hearing. At the beginning of the interrogation, DeSpain told appellant, "You don't have to talk to me. If you choose to talk to me, you can say, 'Boom, I'm out of here,' and we're done." Appellant responded, "I have no problem talking to you." DeSpain then interrogated appellant for about forty minutes. DeSpain confronted appellant with evidence that his car was involved in the murder. Appellant acknowledged during the interrogation that "this looks real bad for me." DeSpain told appellant, "It looks bad for somebody," but DeSpain said he wasn't sure if appellant was a murderer or if appellant loaned his vehicle to somebody who committed a murder. At the conclusion of the interrogation, DeSpain told appellant that the situation was "serious." DeSpain told appellant "we're not going to talk anymore" and turned off the recorder.

DeSpain testified at the suppression hearing that when he turned off the recorder, they got out of the car to stretch their legs. DeSpain asked appellant if he would come to the police station. Appellant was concerned about how he would get home, but DeSpain told appellant that DeSpain would give him a ride home. Appellant rode in the front seat and was not handcuffed. DeSpain told appellant that they would not be discussing the case.

During the forty-five-minute car ride, appellant made statements to DeSpain that were not recorded. DeSpain testified that he asked appellant if he could turn on the recorder during the drive, but appellant declined, so DeSpain did not turn it on. DeSpain testified that he did not ask appellant any questions, and appellant

---

appellant's interrogation by DeSpain, the detective told appellant that officers were still "working on a search warrant for your car."

8

volunteered some information. For example, appellant admitted to going to the decedent's house with appellant's friend, but appellant claimed to have been asleep in the car when shots went off. Before appellant made these statements, DeSpain told appellant, "[T]here comes a time where you have to look out for yourself."[3]

## C. No Custody

Appellant cites no authority to suggest that the seizure of a person's car, coupled with a request for the person to remain at the scene for ten minutes, amounts to a restraint on the person's movement comparable to a formal arrest. Although appellant asked Turner whether he was a suspect, Turner did not tell appellant that he was a suspect or that there was probable cause for his arrest. When DeSpain arrived before execution of the search warrant, he told appellant that appellant did not have to talk and was free to leave. Even if DeSpain developed probable cause to arrest appellant during the drive to the police station, the existence of probable cause was not communicated to appellant. Appellant was told only that the evidence "looked bad" and was "serious."

The *Dowthitt* factors do not indicate that appellant was in custody. *See Gardner*, 306 S.W.3d at 294 & n.48 (citing *Dowthitt*, 931 S.W.2d at 255). Considering all of the objective circumstances, we agree with the trial court that a reasonable person would not perceive the detention, if any, to be a restraint on appellant's movement comparable to a formal arrest. *See Gardner v. State*, 433 S.W.3d 93, 98–100 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (no custody when officers asked to speak with the defendant immediately when they arrived to execute a warrant, patrol cars blocked the defendant's driveway during the

---

[3] Later, appellant was given *Miranda* warnings and made additional inculpatory statements that were recorded. Appellant challenges the admission of the later statements only to the extent they are "fruit of the poisonous tree" of the statements discussed above.

interviews, officers escorted the defendant in and out of a house, officers interviewed the defendant multiple times in a patrol car for more than forty-five minutes, but the defendant was not handcuffed and was told that he was free to end the interrogation and leave the patrol car at any time); *Ervin v. State*, 33 S.W.3d 187, 211 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (no custody when the defendant voluntarily went to a police station to make statements, was told she could leave, remained unhandcuffed throughout statements, and was at the station for four hours to discuss two capital murders); *see also Shiflet v. State*, 732 S.W.2d 622, 630 (Tex. Crim. App. 1985) ("Where a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime, we are unable to hold that under those circumstances such a person is restrained of his freedom of movement. Under those circumstances, he is not in custody."). Appellant was not in custody when he made the statements to Turner or DeSpain before receiving *Miranda* and Article 38.22 warnings.

Appellant's second issue is overruled.

### III. INDIVIDUALIZED SENTENCING

In his third issue, appellant contends that the trial court erred by denying his request for individualized sentencing because appellant was twenty years old at the time of the murder and a mandatory sentence of life without parole required by Section 12.31 of the Penal Code violates the Eighth Amendment to the United States Constitution.

In *Miller v. Alabama*, the United States Supreme Court held that the imposition of a mandatory life-without-parole sentence for a defendant who was under the age of eighteen at the time of the crime violates the Eighth Amendment's

10

prohibition on cruel and unusual punishment. 567 U.S. 460, 465 (2012). This rule contrasts with the application of the Eighth Amendment to adults. *See id.* at 480–82 (noting that its ruling would not undermine precedent upholding mandatory sentences of life without parole for adult offenders in *Harmelin v. Michigan*, 501 U.S. 957 (1991)).

The *Miller* court adopted a categorical rule with the line of demarcation between juvenile and adulthood at a defendant's eighteenth birthday. *See id.* at 465. In doing so, the court relied on its prior holding in *Roper v. Simmons* concerning the death penalty. *See id.* at 469–80. The *Roper* court recognized criticisms of drawing a bright-line rule and rejected them:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

*Roper v. Simmons*, 543 U.S. 551, 574 (2005).

Appellant asks this court to extend *Miller* to defendants who were under the age of twenty-one at the time of their crime. Appellant cites no authority for extending *Miller* to a defendant who was over the age of eighteen at the time of the offense. It appears no Texas court has done so, and neither has any other state or federal appellate court. *See generally, e.g.*, *Burgie v. State*, 575 S.W.3d 127, 128 (Ark. 2019) ("The United States Supreme Court has not extended its holding to offenders that were eighteen when the crime was committed, and federal courts that have addressed this issue have soundly rejected the application of the

11

reasoning in *Miller* and *Graham* to claims raised by petitioners who were eighteen or older when their crimes were committed." (collecting cases)); *People v. Harris*, 120 N.E.3d 900, 914 (Ill. 2018) (declining to extend *Miller* to a defendant who was eighteen at the time of the murder; "[C]laims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected.").

This court is bound by the United States Supreme Court's demarcation concerning mandatory sentences of life without parole for defendants, like appellant, who were over the age of eighteen at the time of their crime. *See, e.g.*, *State v. Guzman*, 959 S.W.2d 631, 633 (Tex. Crim. App. 1998) (noting that Texas courts are bound by United States Supreme Court cases interpreting the United States Constitution).

Appellant's third issue is overruled.

## IV.   CONCLUSION

Each of appellant's issues is overruled.   The trial court's judgment is affirmed.

/s/    Ken Wise
Justice

Panel consists of Justices Wise, Bourliot, and Spain.

Do Not Publish — Tex. R. App. P. 47.2(b).