

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-19-00245-CR

Vanessa **CAMERON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2010CR4286C
Honorable Velia J. Meza, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Irene Rios, Justice

Delivered and Filed: June 30, 2021

AFFIRMED

Vanessa Cameron appeals her conviction for murder. She presents three points of error on appeal: (1) the trial court erred in denying her motion to dismiss the indictment and objection to the jury charge because the doctrine of *in pari materia* required she be tried for criminal solicitation rather than for murder as a party, (2) the trial court erred in denying her motion to suppress her video-recorded statements, and (3) the trial court erred by denying her ex parte motion to approve expenses for an expert witness. We affirm the judgment.

**BACKGROUND**

Vanessa Cameron was indicted on April 21, 2010, for the murder of Samuel Johnson. Cameron pled not guilty, and the case proceeded to her first trial. The jury found Cameron guilty, and she was sentenced to seventy years' imprisonment. In the first appeal, this court concluded Cameron's constitutional right to a public trial was violated during the jury selection phase, reversed the trial court's judgment, and remanded the case to the trial court for a new trial. *Cameron v. State*, 415 S.W.3d 404, 406 (Tex. App.—San Antonio 2013), *vacated & remanded*, 490 S.W.3d 57, 65 (Tex. Crim. App. 2016) (op. on reh'g). On discretionary review, the Court of Criminal Appeals initially affirmed, but issued a new opinion on rehearing that vacated this court's judgment and remanded the case to this court with instructions to apply the sequential two-step test set forth in *Lilly v. State*, 365 S.W.3d 321, 331 (Tex. Crim. App. 2012) to determine if Cameron's right to a public trial was violated. *Cameron v. State*, 490 S.W.3d 57, 65, 70 (Tex. Crim. App. 2016) (op. on reh'g), *cert. denied* 137 S. Ct. 95 (Mem) (2016). Applying *Lilly*, this court again concluded Cameron's Sixth Amendment right to a public trial was violated, reversed the trial court's judgment, and remanded the case for a new trial. *Cameron v. State*, 535 S.W.3d 574, 581 (Tex. App.—San Antonio 2017, pet. ref'd).

Cameron pled not guilty, and the case proceeded to a jury trial for the second time. The State presented evidence that Cameron concocted a plot to murder her former partner and son's father, Johnson, and collect life insurance proceeds. This plot involved three individuals: Cameron's sister, B.J. Brown, and one other individual. The jury found Cameron guilty and sentenced her to life in prison.

Cameron timely filed a notice of appeal.

**DISCUSSION**

**A.** *In Pari Materia*

In her first and second points of error, Cameron argues she was denied due process of law when the trial court erroneously denied her motion to quash the indictment because the doctrine of *in pari materia* entitled her to be tried under the criminal solicitation statute. She further contends the trial court erroneously denied her objection to the jury charge based on the doctrine of *in pari materia* and thereby improperly charged the jury on murder and the law of parties instead of criminal solicitation. This resulted in her receiving a higher sentence than that allowed under the criminal solicitation statute.

Cameron's challenge to the indictment presents a question of law that we review de novo. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Desir v. State*, 543 S.W.3d 865, 867 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The doctrine of *in pari materia* is a rule of statutory construction codified in Texas law as a part of the Code Construction Act. TEX. GOV'T CODE § 311.026; *Jones v. State*, 396 S.W.3d 558, 561-62 (Tex. Crim. App. 2013). Statutes are *in pari materia* when they address "the same general subject, have the same general purpose, or relate to the same person or thing or class of persons or things," with the purpose of a statute being the most significant factor. *Alejos v. State*, 555 S.W.2d 444, 450 (Tex. Crim. App. 1977) (op. on reh'g); *see Burke v. State*, 28 S.W.3d 545, 547 (Tex. Crim. App. 2000). Two penal provisions are *in pari materia* if "one provision has broadly defined an offense, and a second has more narrowly hewn another offense, complete within itself, to proscribe conduct that would otherwise meet every element of, and hence be punishable under, the broader provision." *Azeez v. State*, 248 S.W.3d 182, 192 (Tex. Crim. App. 2008) (quoting *Mills v. State*, 722 S.W.2d 411, 414 (Tex. Crim. App. 1986)) (internal quotation marks omitted). It is not enough to conclude the two offenses are *in pari*

*materia* based on "[t]he adventitious occurrence of like or similar phrases, or even of similar subject matter" if the offenses were enacted for wholly different ends. *Alejos*, 555 S.W.2d at 450.

If we conclude two statutes are *in pari materia*, we must construe them together and, if possible, harmonize any conflicts between them so that all provisions of each statute are given effect. *Jones*, 396 S.W.3d at 561-62. However, if the statutes irreconcilably conflict, due process and due course of law require the State to prosecute under the more specific enactment unless the legislature clearly intended to make the general act controlling. *See id.* at 562; *see also Mills*, 722 S.W.2d at 413-14.

Cameron was charged in an indictment with the offense of murder under sections 19.02(b)(1) and (b)(2) of the Texas Penal Code. She moved to dismiss the indictment on the ground of *in pari materia*, arguing the State would rely on party liability to establish the offense of murder when Cameron instead should have been charged with solicitation to commit murder pursuant to the criminal solicitation statute. *See* TEX. PENAL CODE § 15.03(a). Following a hearing, the trial court denied the motion.

Under sections 19.02(b)(1) and (b)(2) of the Texas Penal Code, a person commits the offense of murder if the person intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death. Under section 15.03(a), a person commits the offense of criminal solicitation if, with intent that a capital felony or first-degree felony be committed, the person "requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission."

In construing the offenses, the plain language and placement in the Penal Code indicate that sections 19.02(b)(1)-(2) and 15.03 are not *in pari materia* because they do not have the same

subject or purpose. The subject and purpose of section 19.02 is to define the elements of and penalize the commission of murder, and it is located in Title 5 of the Penal Code, which addresses crimes against *persons*. By contrast, the subject of section 15.03 is criminal solicitation, and its location in Title 4—Inchoate Offenses—and Chapter 15—Preparatory Offenses—demonstrates the statute is not strictly concerned with crimes against persons, but with punishing people who induce or attempt to induce another to commit a first-degree felony, which may or may not involve injury or death to another person. TEX. PENAL CODE § 15.03(a). Section 15.03 confirms this by stating it is no defense to the prosecution under the criminal solicitation statute that the underlying crime was not actually committed. *Id.* § 15.03(c). Moreover, sections 19.02(b)(1)-(2) and 15.03 are not more narrowly hewn versions of the other because each statute contains elements the other does not. *Jones v. State*, 396 S.W.3d 558, 563 (Tex. Crim. App. 2013). Murder requires the death of an individual. TEX. PENAL CODE § 19.02(b)(1)-(2). Criminal solicitation requires a second person be involved in the commission of the offense. *Id.* § 15.03(a). The criminal solicitation statute does not proscribe conduct that otherwise meets every element of the murder statute; thus, it is not a more specific version of the murder statute. *See Azeez v. State*, 248 S.W.3d 182, 192 (Tex. Crim. App. 2008).

Cameron argues this court should compare criminal solicitation with party liability codified at Texas Penal Code §§ 7.01 and 7.02, not murder. Generally, a comparison of penal statutes to decide whether the doctrine of *in pari materia* applies involves a comparison of *offenses*. *See Mills v. State*, 722 S.W.2d 411, 414 (Tex. Crim. App. 1986) ("In construing penal provisions this Court has on a number of occasions found two statutes to be in pari materia, where one provision has broadly defined *an offense*, and a second has more narrowly hewn *another offense*, complete within itself, to proscribe conduct that would otherwise meet every element of, and hence be

punishable under, the broader provision." (emphasis added)); *see, e.g.*, *Jones*, 396 S.W.3d at 561; *Azeez*, 248 S.W.3d at 192.

Section 7.02 may contain the "adventitious occurrence" of certain terms and subject matter that may be considered similar to § 15.03(a). *See* TEX. PENAL CODE § 7.02(a) ("person is criminally responsible for an offense committed by the conduct of another if: (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense; (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense"); *Alejos v. State*, 555 S.W.2d 444, 450 (Tex. Crim. App. 1977) (op. on reh'g). However, sections 7.02 and 15.03 are not codified in the penal code for the same purpose. *See Alejos*, 555 S.W.2d at 450. Criminal solicitation is a criminal offense in and of itself. TEX. PENAL CODE § 15.03. The purpose of the party liability statute is to expand criminal responsibility for criminal offenses by abolishing "traditional distinctions between accomplices and principals." TEX. PENAL CODE § 7.01. We therefore cannot conclude the trial court erred by denying the motion to dismiss.

Cameron also argues the trial court erred by overruling her objection to the court charging the jury on party liability rather than criminal solicitation because the statutes are *in pari materia*. We review claims of jury charge error by first determining whether error exists and, if error exists, we evaluate whether the error caused harm. *See, e.g.*, *Moreno v. State*, 619 S.W.3d 754, 759 (Tex. App.—San Antonio 2020, no pet.). Because Cameron argues party liability and criminal solicitation are *in pari materia* and we conclude they are not, we cannot conclude there is any jury charge error. *See id.*

Cameron's first and second points of error are therefore overruled.

## B. Motion to Suppress

In her third and fourth points of error, Cameron argues the trial court erred by denying her motion to suppress her video-recorded statements. She contends the statements were induced by lies, false promises of leniency, and threats by the police department, rendering her statements involuntary, in violation of her rights to due process of law, due course of law, and articles 38.21 and 38.22 section 6 of the Texas Code of Criminal Procedure.

Before her second trial, Cameron moved to suppress her video-recorded statements. The court heard the motion during an omnibus hearing addressing multiple motions over two days. During the portion of the hearing addressing the motion to suppress, the state presented the videotape of her statements, and the testimony of San Antonio Police Department (SAPD) Sergeants Kimberly Bower and Lisa Miller. Cameron did not testify or call any witnesses at the hearing in support of the motion to suppress.

Sergeant Bower testified Sergeant Miller contacted Cameron and said she wanted to speak with her and her sister regarding the investigation into Johnson's murder. Sylvia Cameron—Cameron's mother and an SAPD sergeant in internal affairs—drove the adult sisters to SAPD headquarters to be interviewed. When they arrived, Sergeant Miller proceeded to interview Cameron's sister in one interview room and Sergeant Bower and Cameron went into a separate interview room at the homicide office. Cameron's interview room was six feet by eight feet.

At the beginning of the interview, Sergeant Bower read Cameron her rights from a card. Cameron stated she understood her rights and signed the card. At this time, she also told Cameron she was not under arrest. Sergeant Bower's initial questioning focused on getting a timeline of Cameron's whereabouts in connection with the case and background on her relationship with Johnson. Sergeant Bower testified Sergeant Butch Matjeka joined them about halfway into the

interview. Sergeant Matjeka—who Sergeant Bower described as taller than Cameron, but not really intimidating, not particularly muscular, and not a big guy except around the mid-section—sat near the door. Given the size of the interview room and orientation of the camera, Sergeant Matjeka was off camera during his questioning and was only seen when he entered and exited the room.

Cameron's points of error assert that the interview methods the detectives used were unduly coercive and resulted in an involuntary confession. Sergeant Bower testified extensively about the interview methods she and Sergeant Matjeka employed to secure Cameron's video-recorded confession. She testified they lied to Cameron about how much they actually knew and Sergeant Matjeka also misled Cameron, suggesting B.J. Brown was at the station being interviewed. Sergeant Bower initially testified she never threatened Cameron or one of her loved ones and never promised to do anything to help her case. However, Sergeant Bower later admitted that she told Cameron this was her opportunity to come clean and that it might help her with her case. She also told Cameron she should tell the truth now so that she would not be accused of making an excuse if she changed her story later. She also admitted Sergeant Matjeka told Cameron that if Brown told him that Cameron or her sister had something to do with the death of Johnson, this is "no longer not an arrest." Sergeant Bower testified these statements could be interpreted as implying Cameron would be charged. Sergeant Matjeka also told Cameron her family would be protected, he would take care of this with Cameron's mother, and he would do everything in the world to work with Cameron and her mother. Sergeant Bower stated to Cameron that she should think about her son and do what was best for him. Sergeant Matjeka also told Cameron he was asking for the truth, she would be going home that day, he was not going after her sister, and he was only pursuing Brown. Cameron became quiet, less animated, and less verbal after many of these remarks, but her

body language did not change and Sergeant Bower believed she was thinking about what to say next.

Sergeant Bower testified Cameron was never in custody. Cameron was never handcuffed, was told both she and her sister were not under arrest, was told she was free to leave multiple times over the course of the interview, was told she was going home multiple times, and Sergeant Bower showed her the door was unlocked. Cameron was given the opportunity to go to the restroom more than once, and she was asked more than once if she wanted something to drink, but she declined. Sergeant Bower also testified Cameron left the interview room at one point. Sergeant Matjeka informed Cameron that charges might be filed against her in the future, but that day, no matter what she said, she would be going home. At the end of the interview, Sergeant Matjeka told Cameron she was free to leave, and she did leave. Sergeant Bower described the interview as "medium" and "not that long" in duration at two hours and forty-five minutes.

The video of the interview is overwhelmingly consistent with Sergeant Bower's testimony.[1] The interview lasts approximately two-and-a-half hours, but Cameron was interviewed for approximately two hours with Sergeant Matjeka and Sergeant Bower leaving the interview room for about thirty minutes toward the end of the interview. At the beginning of the interview, Sergeant Bower and Cameron entered the room, and Sergeant Bower asked if she wanted water, but she declined. Sergeant Bower read Cameron her rights from a form. Cameron appeared to be listening closely and, at one point, she nodded as Sergeant Bower read them. When Sergeant Bower finished, she asked Cameron if she understood her rights, and Cameron replied "yes." She then told Cameron she was not under arrest. Sergeant Bower then asked Cameron to sign the form, and Cameron signed it. During the first hour of the interview, Sergeant Bower asked Cameron

---

[1] Although Sergeant Bower testified Cameron left the interview room, this could not be confirmed in the video recording.

questions. Cameron understood them and answered them promptly, clearly, and coherently, even laughing at times as she recounted her history with Johnson to Sergeant Bower. Cameron appeared calm and relaxed and even touched Sergeant Bower's notepad while pointing to items on it, apparently to assist the sergeant in recording certain facts. Sergeant Bower asked Cameron more than once whether she wanted water or to go to the restroom. Sergeant Matjeka entered the room at some point during this time and remained quiet for the first hour. Toward the end of the first hour, Sergeant Bower told Cameron she was leaving the interview room to discuss the case with her partner and to ensure Cameron's facts coincided with her sister's facts, and Cameron very calmly said she understood and declined another offer of water.

After Sergeant Matjeka and Sergeant Bower returned around five minutes later, Sergeant Bower reiterated to Cameron that she was not under arrest but noted that if other witnesses implicated Cameron she would have to "do her job." At this point, Sergeant Matjeka began questioning Cameron. He reminded Cameron that her sister would go home that day and said that if SAPD decided to charge her, they would not be serious charges. Sergeant Matjeka reminded Cameron that she would go home at the end of her interview too, but she should try and get ahead of anyone else implicating her. He added that B.J. Brown would not "take this alone" and told her she needed to give up Brown and tell them what happened. He further told her that her family would be protected, and he would take care of this with Cameron's mother. Sergeant Matjeka encouraged Cameron to think of her son and told her lying made her guilty of perjury. Sergeant Matjeka also informed Cameron they were serving a search warrant at her house at that moment. Sergeant Matjeka also read from someone else's statements, which discussed incriminating statements Cameron made to that person. When Cameron refused to concede facts, Sergeant Matjeka told her she was lying, while also reminding her she was not under arrest. Sergeant Matjeka—who was doing almost all of the questioning at this point—was soft-spoken, never raised

his voice, and nothing in the video shows him or Sergeant Bower making any physically threatening motions toward Cameron. Although Cameron remained calm and without emotion throughout this portion of the interview, she does appear a little more tense, running her hands over her face and shifting her body weight in her chair a little bit more often. And her answers became slower and more plodding, but the tone of her voice remained calm. However, Cameron continued to clearly understand all questions and answered them. Moreover, Cameron never lost her temper, never asked to leave the room, and never became visibly emotional. Approximately one-and-a-half hours into the interview, Sergeant Matjeka and Sergeant Bower left the interview room and Sergeant Bower showed Cameron the door was not locked. As they exited the room, Sergeant Matjeka told Cameron not to make any phone calls.

Sergeant Matjeka and Sergeant Bower returned approximately thirty minutes later and told Cameron her sister and Brown's stories were consistent with each other, and they proceeded to question Cameron about the evidence found in her home, the life insurance policy, and what happened to Johnson. Sergeant Matjeka reminded Cameron more than once that she was not under arrest and would go home that night, but she had to tell them why she asked her sister to kill Johnson. He added if she did not, whatever she said about it later would look like a made-up excuse. Sergeant Matjeka encouraged Cameron to make the best plea she could for herself and then go home and spend time with family. He added that her sister was crying and did not give Cameron up easily, but explained that Brown did not care about Cameron and said she should not let him "do all the damage." Cameron eventually stated she would not be going home, but Sergeant Matjeka corrected her, stating she would be going home and told her she could leave that moment if she wanted and her sister was not going to jail at that time. Cameron then confessed her role in the crime to Sergeant Matjeka and Sergeant Bower. During this portion of the interview, Cameron seemed tense but spoke in a calm, coherent manner, appeared to understand everything she was

asked, answered promptly, and did not otherwise become emotional. At no point during the interview did Cameron appear to be under the influence of anything, and she always appeared to be in total control of her mental faculties.

After her confession, Sergeant Matjeka told Cameron to go home and spend time with her son. He said she was not in a lot of trouble at the moment, but it was looking like a murder charge, and she should not commit any other crimes after she left SAPD headquarters or he would ensure she would be in a lot of trouble. He told her he did not tell her the whole truth because he was allowed to lie and told her SAPD did not actually have Brown in custody. After Cameron provided Sergeant Matjeka and Sergeant Bower more information about Brown, Cameron was again told she was not under arrest and should go home.

After the hearing, the trial court denied Cameron's motion to suppress and concluded the video-recorded statements were admissible. The trial court later filed its findings of fact and conclusions of law, which we summarize as follows:

- On January 20, 2010, Cameron called Sergeant Bower inquiring about the investigation of the murder of Samuel Johnson.

- Sergeant Lisa Miller with the SAPD Homicide Division called Cameron and asked her to come speak with detectives.

- Cameron's mother, Sergeant Sylvia Cameron with SAPD, brought Cameron to SAPD headquarters.

- On January 21, 2010, Sergeant Bower interviewed Cameron.

- At the time of Cameron's interview, Sergeant Bower was a Detective for the Homicide Division for SAPD.

- Cameron's interview was recorded.

- SAPD Homicide Sergeant Butch Matjeka participated in Cameron's interview.

- Cameron was not handcuffed or formally placed under arrest.

- Cameron was Mirandized prior to her interview beginning.

- Cameron was told multiple times that she would be going home after her interview.

- Cameron was allowed to use the restroom, offered water, and told she could go to lunch.

- Cameron's interview lasted approximately two hours and forty-five minutes.

- A DVD of Cameron's interview was admitted into evidence at the suppression hearing.

- After Cameron's interview concluded, she left SAPD headquarters.

- The objective circumstances surrounding Cameron's encounter with the detectives do not show that a reasonable person in her situation would believe that she was under restraint to the degree associated with an arrest.

- Cameron was not in custody during the interview with Sergeant Bower, and thus the video-recorded statements were not the result of custodial interrogation.

- Cameron's statements to Sergeant Bower were made under voluntary conditions. *See* TEX. CODE CRIM. PROC. art. 38.22 § 6.

- The statements Cameron made in the video-recorded interview were voluntary and are admissible.

### 1. Standard of Review

In reviewing a motion to suppress, we apply a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We review a trial court's conclusions of law de novo. *Id.* at 328. We give trial courts almost complete deference in determining historical facts. *Id.* at 327-28. When a trial judge makes express findings of fact, we must examine the record in the light most favorable to the ruling and uphold those fact findings if they are supported by the record. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). Although we must defer to the trial court's findings on what an eyewitness or earwitness actually saw or heard that is recorded by video, we "may review de novo 'indisputable visual evidence' contained in a videotape" even if the trial court did not refer to this evidence in its findings. *State v. Duran*, 396 S.W.3d 563, 570-71 (Tex. Crim. App. 2013); *Miller v. State*, 393 S.W.3d 255, 263-64 (Tex. Crim. App. 2012) (considering indisputable visual evidence in addition to trial court's findings).

### 2. Cameron's Video-Recorded Statements and the Due Process Clause

A statement is considered involuntary and therefore a violation of the Due Process Clause of the United States Constitution if: (1) police engaged in objectively coercive activity, (2) the statement is causally related to the coercive government misconduct, and (3) the objectively coercive activity overbore the defendant's will. *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020), *cert. denied*, 141 S. Ct. 1720 (2021). The Due Process Clause protects suspects from police overreaching; it does not protect people from themselves or other private actors, and absent all of the above factors, there is no due process violation. *Oursbourn v. State*, 259 S.W.3d 159, 170 (Tex. Crim. App. 2008) (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).[2]

We review the voluntariness of statements by examining the totality of the circumstances surrounding the statements, including whether the statements were made while in custody. *Lopez*, 610 S.W.3d at 494. We evaluate whether a person was in custody on a case-by-case basis. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). In deciding whether a person was in custody, we must determine whether, under the circumstances of the interrogation, a reasonable person would have perceived her movement was restrained to the degree of a formal arrest. *Id.* In evaluating whether a reasonable person would believe she was restrained to the degree of formal arrest, we consider only objective factors surrounding the detention. *Id.* The Court of Criminal Appeals has identified four general situations that may constitute custody for purposes of *Miranda*

---

[2] In *Osbourn*, the Court of Criminal Appeals, citing *Connelly*, listed some examples of police overreaching that resulted in involuntary statements. Those include: (1) the suspect was subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care unit; (2) the suspect, while on medication, was interrogated for over eighteen hours without food, medication, or sleep; (3) the police officers held a gun to the head of the wounded suspect to extract a confession; (4) the police interrogated the suspect intermittently for sixteen days using coercive tactics while he was held incommunicado in a closed cell without windows and was given limited food; (5) the suspect was held for four days with inadequate food and medical attention until he confessed; (6) the suspect was subjected to five days of repeated questioning during which police employed coercive tactics; (7) the suspect was held incommunicado for three days with little food, and the confession was obtained when officers informed him that their chief was preparing to admit a lynch mob into the jail; (8) the suspect was questioned by relays of officers for thirty-six hours without an opportunity for sleep. 259 S.W.3d at 170-71.

and article 38.22 of the Code of Criminal Procedure: (1) when the person is physically deprived of her freedom of action in any significant way, (2) when a law enforcement officer tells the person she cannot leave, (3) when a law enforcement officer creates a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted, or (4) when there is probable cause to arrest and law enforcement officers do not tell the person she is free to leave. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *Dorch v. State*, 596 S.W.3d 871, 889 (Tex. App.—San Antonio 2019, pet. ref'd).

Cameron argues that Sergeant Matjeka and Sergeant Bower used "multiple problematic tactics" to coerce Cameron's involuntary statements, including placing her in custody. She argues a reasonable person in her position would have believed she was in custody because her mother—a police officer—drove her to the police department for the interview and waited for her, because her home was being searched during the interview, and because Sergeant Matjeka told Cameron not to make any phone calls when he and Sergeant Bower left the interview room, thereby isolating her.

The trial court's conclusion that Cameron was not in custody when she gave the statement is supported by its findings and by the record. A reasonable person in Cameron's position would not have perceived her movement was restrained to the degree of a formal arrest. *See Ortiz*, 382 S.W.3d at 372. The objective factors show, among other things, Cameron was repeatedly told she was not under arrest, repeatedly told she could leave at any time, repeatedly told she was going home that night, and shown that the door to the interview room was unlocked. *See Dowthitt*, 931 S.W.2d at 255. Cameron was neither physically deprived of her freedom of action in any significant way nor placed in a situation that would lead her to believe that her freedom of movement had been significantly restricted. *See id.*

Cameron argues Sergeant Matjeka and Sergeant Bower induced her involuntary statements by making false promises of leniency. A false promise of leniency only offends due process if it was so coercive that the defendant's will was overborne. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). Cameron appears to be referring to the statements suggesting her case would be taken care of. The alleged false promise was almost entirely devoid of specifics with respect to a potential criminal charge, possible sentence, any suggestion of a reduced or eliminated sentence. Cameron never says anything about the alleged promise or any other promise during the interview. There is no evidence Cameron was induced into making a statement by the alleged promise. Viewed under the totality of the circumstances, Cameron's will was not overborne as a result of any promise. *See id.*[3]

Cameron also argues she was lied to during her interview because she was told that neither she nor her sister would be arrested no matter what she said, that Sergeant Matjeka and Sergeant Bower would take care of things, that it was the right thing to do for her son, and Sergeant Matjeka and Sergeant Bower minimized the seriousness of the potential charges against her and her sister. Later they lied to her by suggesting that B.J. Brown had implicated her.

---

[3] Cameron does not appear to contend that her confession was rendered invalid under article 38.21 as a result of false promises of leniency, but the result would be the same. A law enforcement officer's promise renders a confession invalid under article 38.21 if the promise is positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Joseph v. State*, 309 S.W.3d 20, 26 n.8 (Tex. Crim. App. 2010); *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). To determine whether a promise is likely to influence the defendant to speak untruthfully, we look to whether the circumstances of the promise made the defendant inclined to admit a crime she had not committed. *Harty v. State*, 229 S.W.3d 849, 856 (Tex. App.—Texarkana 2007, pet. ref'd). Moreover, the promise at issue must be of an exceptional character before it will invalidate an otherwise voluntary confession. *See Espinosa v. State*, 899 S.W.2d 359, 364 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd); *Guerrero v. State*, No. 04-08-00249-CR, 2009 WL 2525434, at *8 (Tex. App.—San Antonio Aug. 19, 2009, pet. ref'd) (mem. op., not designated for publication). The sergeants' alleged promise is almost entirely devoid of any facts and nothing in the video recording or evidence suggests Cameron was induced by it to falsely confess. *See Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1994) (per curiam) (holding detective's statements promising to try to help out defendant or talk to district attorney not specific promises rendering confession involuntary).

Lying is not the type of overreaching that implicates the Due Process Clause, as long as the subterfuge used is not one likely to produce an untrue statement. *Oursbourn v. State*, 259 S.W.3d 159, 182 (Tex. Crim. App. 2008) (citing *Frazier v. Cupp*, 394 U.S. 731, 737–39 (1969)); *see Wilson v. State*, 311 S.W.3d 452, 462 (Tex. Crim. App. 2010) (quoting leading interrogation manual for police officers as providing verbal trickery, deception, and lies concerning existence of evidence are acceptable interrogation strategies). "The focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a confession not freely determined." *Green v. State*, 934 S.W.2d 92, 99-100 (Tex. Crim. App. 1996).

Sergeant Matjeka and Sergeant Bower's statements were little more than verbal trickery designed to call on Cameron's use of her own intelligence and moral sense of right and wrong. *See id.* at 100. There is no evidence that upon hearing these largely vague and general statements from police officers, Cameron's will was overborne. Moreover, Cameron was repeatedly told she was not under arrest, and she did in fact leave SAPD headquarters after her interview. Under the totality of the circumstances, we cannot say that any deception by Sergeant Matjeka and Sergeant Bower rendered Cameron's statements involuntary.

Cameron also argues that by suggesting that telling the truth would help her, Sergeant Matjeka and Sergeant Bower "disarmed" her *Miranda* warnings. The Court of Criminal Appeals established in *Creager v. State*, that if the appellant was warned before the interrogation "that anything he says can be used against him in a court of law," remarks later made by the interrogator that might have led appellant to believe that a confession would help him do not necessarily render appellant's subsequent statement inadmissible. 952 S.W.2d 852, 856 (Tex. Crim. App. 1997); *Thacker v. State*, No. 08-18-00085-CR, 2020 WL 1303555, at *5 (Tex. App.—El Paso Mar. 19, 202, pet. ref'd). When, as here, an appellant has been properly warned prior to the interview, the

only issue during the interview is whether any statement by a police officer that their confession could be used "for them" overpowered the defendant's will. *See Diamond v. State*, 496 S.W.3d 124, 139 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (where appellant was not in custody, rejecting argument that officer improperly implied appellant's statement might be used on his behalf, because officer provided warnings that substantially complied with warnings statute and no evidence will was overborne). *See generally Oursbourn v. State*, 259 S.W.3d 159, 170 (Tex. Crim. App. 2008) (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). The video shows Sergeant Bower read the warnings to Cameron, Cameron listened intently, nodded in agreement, and signed the document containing those same warnings. No evidence suggests Cameron's will was overborne.

Finally, Cameron argues Sergeant Matjeka and Sergeant Bower explicitly and implicitly threatened her, by suggesting she and her sister would be charged if she did not confess and suggesting "it would no longer be a non-arrest situation" if B.J. Brown implicated her or her sister before Cameron confessed. Threats may render statements involuntary under the Due Process Clause, but only when they constitute police overreach. *See Lopez v. State*, 610 S.W.3d 487, 496 (Tex. Crim. App. 2020), *cert. denied*, 141 S. Ct. 1720 (2021). To determine whether Sergeant Matjeka and Sergeant Bower objectively engaged in coercive tactics, we consider the statements and the circumstances surrounding the complained-of threats, including the context in which they were made, the demeanor of the person who made them, the truth or falsity of the statements, and any other circumstance in evidence that might address the voluntariness of the statements. *See id.* at 496-97.

After considering the testimony at the suppression hearing, reviewing the video-recorded statements, and viewing the record in the light most favorable to the trial court's ruling, we conclude the alleged threats by Sergeant Matjeka and Sergeant Bower did not constitute

objectively coercive conduct that overbore Cameron's will. *See id.* at 497. The record supports the trial court's findings that Cameron voluntarily went to the police station for her interview; she was repeatedly offered water and declined, she was read her rights, she was repeatedly told she was not under arrest and would be going home, she was repeatedly told she was free to leave, she was not handcuffed, and she did leave. *See id.* Moreover, the interview only lasted approximately two-and-a-half hours, thirty minutes of which consisted of Cameron sitting in the interview room alone. *See id.*

The video shows Sergeant Bower telling Cameron she knew that Brown killed Johnson and that if Brown told them that Cameron or her sister had something to do with the crime, "this would no longer be a non-arrest" situation. Sergeant Matjeka also stated that if Cameron were worried about her sister, they were not looking to implicate her for murder, unless Brown wanted to "give her up and say it was her idea. She is only looking at nothing right now. She gets to go home when this [interview is] over with." Cameron was also told she was not under arrest. Sergeant Bower and Sergeant Matjeka's statements merely explained to Cameron what might happen and the state of the investigation. *See id.* at 497. Sergeant Matjeka and Sergeant Bower had not yet spoken with Brown. Sergeants Matjeka and Bower had just left the interview room, presumably to discuss the case and determine whether Cameron's sister had confessed. They were also in the process of searching Cameron's home—where Cameron's sister and Brown lived too—pursuant to a warrant. They were aware of some evidence suggesting Cameron and her sister were involved in the crime, but they were still investigating the crime and had not yet determined they had enough evidence to rule out that Brown acted in concert with Cameron and her sister, that Cameron and her sister acted together without Brown, or that Brown acted alone. *See id.* at 497-98. If detectives therefore were able to interview Brown and Brown confessed to the crime and credibly implicated Cameron and her sister, that combined with other evidence could have resulted in both Cameron

and her sister's arrest for the crime. Moreover, Cameron did not respond to any of the foregoing statements by immediately confessing to the crime. During this part of the interview, she remained calm and without emotion, but appeared a little more tense in comparison to when the interview first started. The videotape shows Cameron clearly understood all questions she was asked and calmly answered them, never lost her temper, and never asked to leave the room.

The totality of the circumstances surrounding Cameron's statements supports that they were voluntary. We therefore conclude the alleged "problematic tactics" used by Sergeant Matjeka and Sergeant Bower did not constitute police overreach, either individually or cumulatively, and were not objectively coercive conduct that overbore Cameron's will, and therefore did not violate Cameron's rights under the Due Process Clause.[4] We overrule Cameron's third point of error.

### 3. Code of Criminal Procedure article 38.22 § 6

Cameron next argues Sergeant Matjeka and Sergeant Bower used psychologically coercive techniques that rendered her statements involuntary under article 38.22, section 6 of the Texas Code of Criminal Procedure. Cameron identifies, among other things, the fact that her mother—a police officer—drove her to the police station after lunch and remained in the lobby while her daughters were being interviewed and because Sergeant Matjeka told her not to make any phone calls as he left the interview room. Cameron argues Sergeant Matjeka and Sergeant Bower were aware they were dealing with a "fragile" person, Cameron had suffered years of physical and psychological abuse from the decedent, and Cameron's state of mind in combination with the police officers' coercive techniques rendered her statements involuntary.

---

[4] Although Cameron contends that her statements were rendered involuntary in violation of her right to due course of law, Cameron identifies no authorities in support of her contention, and we therefore do not consider her contention based on due course of law. TEX. R. APP. P. 38.1(i).

A due process claim that a statement is involuntary is concerned with an objective assessment of police behavior to determine if the defendant's will was overborne, not with the state of mind of a criminal defendant. *Oursbourn*, 259 S.W.3d at 171; *see Lopez*, 610 S.W.3d at 494-95. However, an evaluation of voluntariness under article 38.22 section 6 of the Texas Code of Criminal Procedure, may involve sweeping inquiries into the state of mind of a defendant that are not relevant to due process because the statute is designed to protect people from themselves. *Lopez*, 610 S.W.3d at 495; *Oursbourn*, 259 S.W.3d at 172. Fact scenarios encompassed by section 6 are broader in scope than those covered by police coercion or custody under the Due Process Clause and may include confessions made under the duress of hallucinations, illness, medications, or private threats, for example. *See* TEX. CODE CRIM. PROC. art. 38.22 § 6; *Lopez*, 610 S.W.3d at 495; *Oursbourn*, 259 S.W.3d at 172.

Nothing suggests Cameron was psychologically coerced into making her statements. She appeared throughout the video to understand each question she was being asked, she answered each question in a calm and coherent manner, she appeared in total control of her mental faculties, and nothing in the video would suggest she was under the influence of anything. Cameron may have been fragile and vulnerable or susceptible to psychological pressure, but the evidence does not support this, and Cameron fails to explain how such a state of mind would render her statements involuntary.

Based upon our review of the transcript of the suppression hearing and the video-recorded statements, and viewing the record in the light most favorable to the trial court's ruling, we conclude Cameron's incriminatory statements were not coerced, were freely and voluntarily made, and did not violate article 38.22 section 6. *See Lopez*, 610 S.W.3d at 494.

Cameron's fourth point of error is therefore overruled.

**C. Motion to Approve Expenses for Consulting/Testifying Expert Witness**

In her final three points of error, Cameron contends the trial court erred by denying her motion to approve expenses for a consulting/testifying expert witness, violating her rights to due process, equal protection, effective assistance of counsel, and the reimbursement provisions for expenses set forth in article 26.05 of the Code of Criminal Procedure.

We review the trial court's ruling for abuse of discretion. *Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim. App. 2008). The State must provide a defendant with the "basic tools" to present a defense, but it is not required to purchase for an indigent defendant all the assistance that their "wealthier counterparts might buy." *Rey v. State*, 897 S.W.2d 333, 337 (Tex. Crim. App. 1995) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). In determining whether an expert witness should be considered a basic part of a defense in a given case and should therefore be appointed and approved for expenses, we examine three factors: (1) the private interest that will be affected by the action of the State, (2) the State's interest that will be affected if the safeguard is provided, and (3) the probable value of the additional procedural safeguards that are sought and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Id.* (citing *Ake*, 470 U.S. at 77). With respect to the private interest, a defendant's interest in the accuracy of a proceeding where their life or liberty is at stake weighs heavily in the analysis. *Id.* The second factor addresses the State's concern for judicial economy, but it is not as substantial as the State's interest in an accurate outcome at trial. *Id.*

The third factor, which is the weightiest, places the burden on the defendant to show how the expert at issue would assist in her defense before being entitled to the appointment of the expert. *Griffith*, 983 S.W.2d at 286-87. In order to make this showing, the defendant must provide the trial court with information about what evidence will be presented against the defendant and how the expert will assist the defendant in rebutting such evidence. *Rey*, 897 S.W.2d at 341; *see*

*Vergara v. State*, No. 04-12-00187-CR, 2013 WL 749774, at *1 (Tex. App.—San Antonio Feb. 27, 2013, pet. ref'd) (mem. op., not designated for publication). In doing so, the defendant must offer more than vague, conclusory, or undeveloped assertions that the requested assistance would be beneficial. *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997); *see Coleman v. State*, No. 11-11-00039-CR, 2013 WL 779898, at *11 (Tex. App.—Eastland Feb. 28, 2013, no pet.) (mem. op., not designated for publication). The central question is whether the defendant can show the failure to appoint the requested expert would create a high risk of an incorrect verdict. *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999). In general, courts have concluded a defendant did not make such a showing if the defendant failed to (1) support their motion with affidavits or other evidence in support of their defensive theory, (2) explain the theory or why expert assistance would be helpful in establishing it, or (3) show there was a reason to question the State's expert and proof.[5] *Rey*, 897 S.W.2d at 341.

Cameron filed her ex parte motion to approve expenses for a consulting/testifying expert witness a week before trial, after the trial court denied her motion to suppress the video-recorded statements. The motion stated Cameron's attorney required the appointment of Dr. Richard Ofshe in order to effectively cross-examine the detectives that interviewed Cameron and "bring to light all relevant evidence and expert opinion with regard to the methods employed" by the detectives "including the dangers of a false or involuntary confession." In the motion, Cameron's attorney conceded he was familiar with the methods employed by detectives and could reasonably identify aspects of the interview that were "problematic" in the detectives' attempt to secure a confession, including the use of the "Reid Method." However, counsel stated he lacked the academic expertise or training necessary to properly analyze these interrogation tactics in an objective light and to

---

[5] The State did not offer an expert to support the voluntariness of Cameron's video-recorded statements, either at the hearing on the motion to suppress or at trial.

explain the concepts to a jury. He stated Dr. Ofshe—a professor emeritus of sociology at the University of California, Berkeley, who held a Ph.D. in sociology with a specialty in "social psychology" from Stanford University, and who was a member of multiple prominent sociological and psychological associations—previously testified in "several high-profile criminal trials and appeals." The motion stated that without Dr. Ofshe's testimony, Cameron would not be able to effectively challenge the validity of her confession—the single most damaging piece of evidence against her because Cameron was not at the scene of the crime and no physical evidence connects her to the offense. The motion stated the defense required approval of $12,000 to retain Dr. Ofshe, including trial preparation, two days of trial, and a discounted rate for travel time.

Cameron did not attach any affidavits or other evidence to the motion in support of the defensive theory, and Cameron did not seek to use Dr. Ofshe as an expert in opposition to a state expert on the same issue. Cameron's attorney explained he was familiar with the methods employed by detectives and could reasonably identify aspects of the interview that were "problematic," despite his contention in vague and conclusory terms that he required the academic expertise and training of Dr. Ofshe to explain coercive police tactics to the jury. Cameron's attorney did not identify a single case in which Dr. Ofshe testified regarding coercive interrogation tactics or false confessions, offer anything to the court demonstrating Dr. Ofshe's expertise in the subject matter, or otherwise make a showing of how Dr. Ofshe would help the jury understand the evidence or determine facts in issue.[6] Because Cameron failed to carry her burden in demonstrating a need for the expert under the third *Ake* factor, we cannot conclude the trial court abused its

---

[6] The trial court's order denying Cameron's motion states the court heard the motion and considered the merits of the motion. The record is silent as to whether counsel orally presented any additional argument or evidence in support of the motion. Cameron's bill of exceptions on this point of error, filed at the conclusion of the evidence, contains the text of an email from Dr. Ofshe, stating his preliminary findings and the further work he would do if retained. However, this email is dated three days after the trial court ruled on Cameron's motion and the record does not reflect it was presented to the trial court before both sides had rested.

discretion in denying the ex parte motion. Moreover, in denying Cameron's motion to suppress the video-recorded statements, the trial court had already concluded the evidence showed Cameron's confession was voluntary. *See Ivie v. State*, 407 S.W.3d 305, 311-12 (Tex. App.—Eastland 2013, pet. ref'd) (holding trial court did not abuse its discretion when it denied request to appoint expert where motion not supported by affidavits); *Coleman v. State*, No. 11-11-00039-CR, 2013 WL 779898, at *11 (Tex. App.—Eastland Feb. 28, 2013, no pet.) (mem. op., not designated for publication) (concluding trial court did not abuse discretion in denying motion for appointment of expert in psychology and coerced/involuntary confessions because motion made last minute, trial court already determined that evidence showed appellant not mentally overborne and statements voluntary, and motion not supported by affidavits and contained only conclusory, vague, and undeveloped assertions); *see also* TEX. R. EVID. 702 (expert may testify if expert's scientific, technical, or other specialized knowledge will help trier of fact to understand evidence or to determine fact in issue); *Basso v. State*, No. 73672, 2003 WL 1702283, at *5-6 (Tex. Crim. App. Jan. 15, 2003) (stating issue of false confessions "is not of the kind that requires scientific or other expert testimony to assist the jury in its determination of the relevant facts").

Cameron also argues the trial court's denial of her ex parte motion denied her effective assistance of counsel, citing *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) and *Rey v. State*, 897 S.W.2d 333 (Tex. Crim. App. 1995). Cameron appears to cite *Crane* for the proposition that criminal defendants are constitutionally guaranteed a meaningful opportunity to present a complete defense. 476 U.S. at 690-91. Cameron appears to cite *Rey* because the Court of Criminal Appeals observed there is a "relationship between the fundamental right to effective assistance of counsel and the indigent's right to the appointment of an expert." 897 S.W.2d at 345 n.13 (citing *McBride v. State*, 838 S.W.2d 248, 251-52 (Tex. Crim. App. 1992)). Taken together, Cameron appears to be arguing that in order to present a complete defense and receive effective assistance of counsel,

a defendant must be permitted the opportunity to appoint an expert in their defense. However, *Rey* establishes that while the State must provide a defendant with the basic tools to present a defense, including an expert, that requirement is subject to the three factors set forth in *Ake*. *See Rey*, 897 S.W.2d at 337 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). Similarly, Cameron asserts the denial of her ex parte motion violated her rights under article 26.05(a) of the Texas Code of Criminal Procedure, citing *Rodriguez v. State*, 906 S.W.2d 70 (Tex. App.—San Antonio 1995, pet. dism'd). However, as *Rodriguez* makes clear, we apply the *Ake* standard to determine whether the trial court erred in denying a motion brought under article 26.05. Because Cameron did not meet her burden to show her need for an expert under *Ake*, we cannot conclude the trial court's holding violated her right to effective assistance of counsel or article 26.05(a). *See Rey*, 897 S.W.2d at 337.

Cameron's final three points of error are therefore overruled.[7]

## CONCLUSION

We affirm the trial court's judgment.

Luz Elena D. Chapa, Justice

PUBLISH

---

[7] Cameron asserts in her fifth point of error that the trial court's denial of her ex parte motion violated her right to equal protection but does not cite any relevant authorities or otherwise offer any discussion or analysis in support of the issue. *See* TEX. R. APP. P. 38.1(i). Because we have concluded that based on this record the trial court's denial of the ex parte motion did not violate *Ake*, and because Cameron offers no other basis to challenge the trial court's denial of the ex parte motion as a violation of her right to equal protection, we cannot conclude the trial court's denial of the ex parte motion violated Cameron's right to equal protection.